**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

ELECTRONICALLY
FILED
08/03/2026
U.S. DISTRICT COURT
Northern District of WV

**BRENEN LORIENT and**
**JAVAN BUCHANAN,**

**Plaintiffs,**

**v.** **Civil Action No. 1:26-CV-94 (Kleeh)**

**NATIONAL COLLEGIATE**
**ATHLETIC ASSOCIATION,**

**Defendant.**

---

## COMPLAINT FOR INJUNCTION AND DECLARATORY JUDGMENT

---

Plaintiffs Javan Buchanan and Brenen Lorient ("Plaintiffs"), by counsel, bring this action and seek temporary, preliminary, permanent, and declaratory relief prohibiting Defendant National Collegiate Athletic Association ("NCAA") from enforcing arbitrary and capricious decisions, breaching its contracts with its member institutions, and preventing them from participating in college sports.

## PARTIES

1. Plaintiff Javan Buchanan is a natural person who resides in Morgantown, Monongalia County, West Virginia.

2. Plaintiff Brenen Lorient is a natural person who resides in Morgantown, Monongalia County, West Virginia.

3. Defendant NCAA is a nonprofit unincorporated association of colleges and universities with its principal place of business in Indianapolis, Indiana, which does business and participates in collegiate sports throughout the United States and in selected foreign countries.

**JURISDICTION AND VENUE**

4. This matter concerns Plaintiffs' right to obtain educational, athletic, and economic opportunities and to compete in NCAA Division I athletics, including but not limited to at West Virginia University in Morgantown, West Virginia.

5. The parties are completely diverse.

6. Damages in this matter are more than Seventy-Five Thousand Dollars ($75,000.00).

7. This Court has federal-question and antitrust jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Plaintiffs assert a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs seek damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and temporary, preliminary, and permanent injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

8. This Court has supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative fact as Plaintiffs' federal antitrust claim and form part of the same case or controversy.

9. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and temporary, preliminary, and permanent injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and Federal Rule of Civil Procedure 65.

10. This Court may exercise personal jurisdiction over the NCAA because the NCAA transacts business in the Clarksburg Division of the Northern District of West Virginia. Defendant

and its member institutions conduct athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities in the Northern District of West Virginia.

11. Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and threatened injuries giving rise to Plaintiffs' claims occurred or will occur in Monongalia County, West Virginia, within the Clarksburg Division.

12. Based on the facts stated above and herein, and the statutory and case law of West Virginia, the United States District Court, Northern District of West Virginia, has diversity jurisdiction over the causes and claims asserted in this Complaint.

13. Based on the facts stated above and herein, and the statutory and case law of West Virginia, the United States District Court, Northern District of West Virginia, has pendent jurisdiction over the causes and claims asserted in this Complaint.

14. Based on the facts stated above and herein, venue is proper in the Northern District of West Virginia.

**FACTUAL BACKGROUND**

15. Plaintiff Buchanan began to play collegiate sports in the 2022-2023 season at Indiana Wesleyan University; an NAIA institution not governed as an NCAA Division I member.

16. Plaintiff Buchanan competed for two seasons at NAIA Indiana Wesleyan before transferring to Boise State University.

17. Plaintiff Buchanan competed in NCAA Division I sports for two seasons at Boise State and completed his undergraduate degree in May 2026, for a total of four seasons of participation in competition.

18. Plaintiff Buchanan signed a grant-in-aid to attend and has been accepted to enroll at West Virginia University ("WVU") and seeks to participate in one additional season of NCAA competition while pursuing a master's degree in Sports Management.

19. Bylaw 14.6 of the 2025–26 NCAA Division I Manual permits a student-athlete who has received a baccalaureate degree to participate while pursuing permissible postgraduate or postbaccalaureate coursework, provided the student-athlete has eligibility remaining and participates within the applicable five-year eligibility period. The 2026-2027 season in which Plaintiff Buchanan seeks to participate falls within his existing five-year eligibility period, being his fifth year.

20. The NCAA counts Plaintiff Buchanan's two NAIA seasons, (NAIA Division being a non-NCAA governed division that receives no compensation of any kind from the NCAA nor oversight, guidance, and enforcement activities) and the two Boise State seasons against the four-seasons-of-competition limit.

21. Plaintiff Buchanan sought a waiver and legislative relief from the seasons-of-competition limitation contained in Bylaw 12.6 of the 2025–26 NCAA Division I Manual. Although Buchanan competed for two seasons at Indiana Wesleyan, he requested only that one season of NAIA participation not count against the four-seasons-of-competition limit, which would permit him to compete during the fifth year of his existing eligibility period. Buchanan did not request an extension of his five-year eligibility period. He maintains that his request therefore should have been considered under the NCAA's provisions and procedures governing seasons of competition and legislative relief rather than as a request to extend the five-year eligibility period.

22. The NCAA denied that request on April 24, 2026.

23. Plaintiff Buchanan's request for waiver and legislative relief is consistent with the NCAA's subsequent decision to replace the former four-seasons-of-competition limitation with an age-based eligibility model that permits qualifying athletes to compete throughout a continuous five-year eligibility period. Plaintiff Buchanan meets all of the criteria established by the NCAA for five (5) years of competition in the age based eligibility model adopted by the NCAA effective as of August 3, 2026. On or about June 11, 2026, Plaintiff Buchanan sought an appeal of the NCAA's denial of his waiver and such appeal was denied.

24. Without eligibility and the associated athletic aid, Plaintiff Buchanan's ability to attend WVU or any higher education institution and pursue a graduate degree is severely limited or practically foreclosed.

25. Denial also threatens Plaintiff Buchanan's NIL compensation, institutional revenue sharing, national exposure, and professional-development opportunities.

26. The NCAA has created a system of impediments to and series of costs for student athletes such as Plaintiff Buchanan for playing college sports at non-NCAA member institutions.

27. The counting of non-NCAA institutions participation against the eligibility of student athletes discourages student-athletes from attending non-NCAA institutions, regardless of whether a student athlete needs or desires additional time to academically or maturity wise to prepare for a four-year college. The NCAA uses such arbitrary applications to punish student athletes in favor of the NCAA.

28. The result is not just harm to individual student-athletes, but the creation of a "pride of place" for the NCAA, which pushes student-athletes to attend an NCAA institution if at all possible because a student athlete will lose a year of eligibility regardless and, hence, be penalized for attending a non-NCAA institution.

29. Plaintiff Lorient began to play in collegiate sports in the 2022-2023 season in NCAA Division I sports at Florida Atlantic University ("FAU").

30. Plaintiff Lorient's freshman season at FAU was primarily developmental. Brenen appeared in twenty-one (21) games for a total playing time of approximately seventy-four (74) minutes.

31. NCAA counts any competition as a full season of competition unless a listed exception applies. Thus, the NCAA treats Plaintiff Lorient's very limited minutes as a complete season.

32. Plaintiff Lorient did not understand, nor did his then-school advisors, that this limited participation would count as a full-season competition. Had he understood or been advised of that consequence, he would have sought to preserve the season.

33. In spring 2024, FAU Head Coach Dusty May left FAU for the University of Michigan. Plaintiff Lorient then, having lost his Head Coach at FAU transferred to the University of North Texas.

34. In 2025, North Texas Head Coach Ross Hodge left for WVU. Plaintiff Lorient followed Coach Hodge to WVU.

35. Plaintiff Lorient competed for WVU during 2025–26 and graduated from WVU in August 2026.

36. Plaintiff Lorient desires to pursue a master's degree and compete during 2026–27 at WVU or another Division I institution. Plaintiff Lorient sought a waiver and legislative relief from the seasons-of-competition limitation contained in Bylaw 12.6 of the 2025–26 NCAA Division I Manual. He requested that his approximately seventy-four minutes of primarily

developmental freshman participation not be treated as an entire season of competition. The NCAA denied that request.

37. Ignoring the facts and letter of support from Plaintiff Lorient's previous Head Coach, and arbitrarily and inconsistently counting approximately seventy-four minutes of developmental freshman participation as an entire season excludes Plaintiff Lorient from the 2026–27 Division I labor market and threatens the loss of NIL, revenue sharing, training, exposure, and professional-development opportunities.

**THE NCAA AND ITS ELIGIBILITY FRAMEWORK**

38. The NCAA is a voluntary, self-governing association of colleges, universities, and conferences that regulate intercollegiate sports, including eligibility and participation.

39. NCAA member institutions must agree to comply with NCAA rules and enforcement mechanisms as a condition of membership and competition.

40. Under Bylaw 12.6 and 12.6.1 of the 2025-26 NCAA Division I Manual, a Division I student-athlete was generally limited to five (5) calendar years to complete four (4) seasons of intercollegiate competition in a given sport. This period was commonly known as the student athlete's "eligibility clock," which began with the student athlete's first semester or quarter of full-time enrollment at any collegiate institution.

41. The NCAA substantially revised Bylaw 12.6 effective August 1, 2026. Unless otherwise indicated, references in this Complaint to "former Bylaw 12.6" refer to the seasons-of-competition rules contained in the 2025–26 NCAA Division I Manual and in effect when Plaintiffs submitted their requests for relief and the NCAA denied those requests. References to "amended Bylaw 12.6" or the "new age-based eligibility model" refer to Bylaw 12.6 as amended effective August 1, 2026.

42. Bylaw 9.3.1.3 of the 2025-26 NCAA Division I Manual authorized an institution to appeal an NCAA staff decision concerning application of NCAA legislation to a particular situation to the Committee for Legislative Relief when no other entity, other than the Board of Directors, had authority to act. The 2026-27 Manual retains legislative-relief review under Bylaw 9.3.1.3 but assigns review to the Cabinet or another committee within its area of authority.

43. The NCAA routinely grants relief from the four-seasons-of-competition limitation through a variety of exceptions, waivers, and reinstatement mechanisms. For example, NCAA rules permit certain football student-athletes to compete in up to four contests without using a season of competition and permit medical-hardship relief when an athlete participates in only a limited portion of a season before suffering a season-ending injury.

44. Under the former framework, the NCAA maintained discretionary authority to grant eligibility relief. Former Bylaw 12.6.1.7 authorized the Committee on Student-Athlete Reinstatement, by a two-thirds vote, to approve waivers of the five-year rule "as it deems appropriate." Although Plaintiffs do not seek extensions of their five-year periods, this provision demonstrates that the former framework was not absolute or inflexible.

45. The former framework nevertheless contained numerous exceptions and forms of relief. For example, former Bylaw 12.6.3.1.6 permitted a Division I football student-athlete to compete in up to four contests without using a season of competition. The NCAA also administered medical-hardship relief, reinstatement procedures, legislative-relief waivers, sport-specific exceptions, blanket waivers, and individualized eligibility determinations. Effective August 1, 2026, amended Bylaw 12.6 replaced the former four-seasons-of-competition limitation with a continuous five-year period of eligibility beginning with the earlier of initial full-time collegiate enrollment or the age-based trigger stated in the rule. The amended framework no longer

separately counts seasons of competition and provides in Bylaw 12.6.8 that there shall be no waivers of the five-year period of eligibility.

46. Plaintiffs do not challenge the concept of a defined five-year period of eligibility or the NCAA's adoption of amended Bylaw 12.6.

47. Plaintiffs challenge the NCAA's transition treatment that denies them the benefit of amended Bylaw 12.6 even though both remain within the fifth year of their existing eligibility periods.

48. Neither Plaintiff seeks an extension of his five-year eligibility period. Plaintiff Lorient seeks relief from treating approximately seventy-four minutes of freshman participation as an entire season under former Bylaw 12.6.3.1, while Plaintiff Buchanan seeks relief from counting one of his two seasons of NAIA participation against the four seasons available under former Bylaw 12.6.

49. Plaintiffs fall within the transition group that retains time within an existing five-year eligibility period but are denied the benefit of amended Bylaw 12.6 because the NCAA treated the 2025-26 season as each Plaintiff's fourth and final season under the former framework.

50. The disparate transition treatment is demonstrated by the opportunities afforded to surrounding groups: many athletes preceding Plaintiffs received fifth or later seasons through COVID-related relief and other exceptions, while qualifying athletes governed by amended Bylaw 12.6 may compete throughout the continuous five-year period. Plaintiffs and similarly situated athletes whose fourth season occurred in 2025-26 are denied comparable treatment.

51. This arbitrary treatment of the 2025/2026 student athletes directly interferes with and threatens Plaintiffs Buchanan and Lorient's right to compete for revenue sharing, NIL opportunities, training, exposure, and professional-development opportunities

52. The NCAA has also declared athletes with extensive prior professional or international basketball experience eligible under rules that distinguish professional competition from intercollegiate seasons. Those decisions bear on the NCAA's asserted concerns about experience, competitive balance, and preservation of a distinct collegiate product.

53. The NCAA's Constitution and Division I Manual regulate student-athlete welfare, eligibility, education, benefits, compensation, governance participation, and access to relief procedures. Those governing documents expressly contemplate student-athletes as a protected constituency, provide athletes governance representation and benefits, and require administration grounded in fairness, honesty, responsibility, academic integrity, and athlete well-being.

**Business of College Basketball**

54. College sports are commercial activity, and the NCAA and its Division I member institutions collectively regulate the labor market in which athletes provide services. College sports are big business, and the NCAA is the biggest player in that business.

55. In fact, the NCAA has both monopsony power over the services of college athletes and monopoly power over the performance and broadcasts of college sports in the relevant market hereto.

56. Bylaw 16.13.1 authorizes participating institutions to provide direct payments, benefits, and expenses to student-athletes subject to the applicable benefits cap and reporting requirements.

57. Bylaw 22.01.1 authorizes compensation for use of an athlete's NIL based in whole or in part on athletic skill or reputation. Bylaws 22.1.1 and 22.1.2 authorize institutional and non-institutional NIL agreements, with institutional agreements limited by the athlete's eligibility period.

58. The relevant market is the labor market for the athletic services of NCAA Division I men's basketball players. The relevant geographic market is nationwide and encompasses all NCAA Division I institutions offering men's basketball programs and competing throughout the United States for athlete services.

59. Division I institutions compete for athlete services through athletic aid, NIL opportunities, institutional revenue-sharing payments, coaching, playing opportunities, facilities, training facilities, education, media exposure, and professional-development opportunities.

60. Division I men's basketball offers a unique cluster of elite competition, scholarships, undergraduate and graduate education, national media exposure, high-level coaching, professional-quality facilities, NIL compensation, institutional revenue sharing, and professional scouting.

61. From the perspective of athletes supplying basketball services, lower NCAA divisions, NAIA institutions, junior colleges, and professional leagues do not provide interchangeable employment opportunities offering that combined package.

62. Professional leagues do not provide the same combination of U.S. graduate education, athletic scholarships, campus-based training, nationally televised collegiate competition, NIL opportunities, and institutional revenue sharing.

63. The NCAA and its Division I members collectively possess substantial buyer-side power. More than 350 Division I men's basketball programs operate under the same NCAA eligibility legislation, and no individual member institution may disregard that legislation without risking sanctions.

64. The finite number of Division I roster positions and the absence of alternatives offering the same combined package of education, aid, revenue sharing, NIL value, national

exposure, elite coaching, facilities, competition, and professional scouting reinforce that collective power. NCAA member Universities cannot independently decide to roster and compensate Plaintiffs without risking NCAA penalties.

65. The challenged rules and decisions substantially affect interstate trade and commerce. Division I institutions recruit athletes across state lines; teams travel and compete nationally; games and the NCAA Tournament are broadcast and streamed across state lines; media, sponsorship, NIL, and institutional-benefit agreements involve interstate commerce; and institutions compete nationally for athlete labor. The NCAA also determines access to payments and agreements that the Manual expressly ties to eligibility under Bylaws 16.13.1.1 and 22.1.1.

66. The NCAA enjoys nearly complete dominance of, and exercises monopsony power in the market for athletic services in Division I basketball.

67. There are no viable substitutes for the NCAA as NCAA's Division I collegiate division is essentially the relevant market for elite college basketball.

68. The NCAA has the power to restrain trade in the college basketball market in any way and at any time they wish to do so, without any meaningful risk of diminishing their market dominance. The business activities of the NCAA that are the subject of this action are within the flow of, are substantially affected by, and directly affect interstate commerce throughout the United States by the NCAA transacting business in multiple states in a continuous and uninterrupted flow of interstate commerce.

**The NCAA's Treatment of Professional and International Basketball Players**

69. The NCAA has afforded eligibility relief to numerous athletes with extensive professional basketball experience, undermining any assertion that prior basketball experience

alone justifies denying relief to Plaintiffs. These eligibility determinations demonstrate that the NCAA routinely distinguishes between professional participation and seasons of competition and has exercised substantial discretion when administering its eligibility rules.

70. James Nnaji accumulated multiple seasons of professional basketball experience in Europe before enrolling at Baylor University. Nnaji was selected with the 31st pick in the 2023 NBA Draft and participated in NBA Summer League competition. Despite those accomplishments and his extensive professional experience, the NCAA granted Nnaji four seasons of Division I eligibility at Baylor. Nnaji's eligibility reflects the NCAA's willingness to permit athletes with significant professional backgrounds to compete in Division I basketball.

71. London Johnson signed a seven-figure contract with NBA G League Ignite and spent multiple seasons competing professionally before seeking to return to college basketball. According to publicly reported accounts, the NCAA determined that Johnson remained eligible notwithstanding his professional participation and compensation history. The NCAA thereby permitted Johnson to pursue Division I basketball after years of professional competition.

72. Thierry Darlan spent two seasons competing in the NBA G League before seeking NCAA eligibility. The NCAA nevertheless ruled Darlan eligible to compete at Santa Clara University and granted him two seasons of remaining collegiate eligibility. Public reports indicate that the NCAA's determination was based on the athlete's age and eligibility framework rather than treating his prior professional participation as seasons of exhausted competition.

73. Abdullah Ahmed competed in the NBA G League before seeking to participate in NCAA basketball. The NCAA subsequently granted Ahmed collegiate eligibility, and public reports indicated that he received three seasons of remaining NCAA eligibility at Brigham Young

University. Ahmed's eligibility provides another example of the NCAA preserving eligibility despite substantial prior professional experience.

74. The NCAA has likewise permitted numerous former international professional players to compete in Division I basketball notwithstanding substantial prior professional experience. Publicly reported examples include Thijs De Ridder (Virginia), Luka Bogavac (North Carolina), Mihailo Petrovic (Illinois), Sananda Fru (Louisville), Rubén Dominguez (Texas A&M), Neoklis Avdalas (Virginia Tech), Dame Sarr (Duke), Musa Sagnia (North Carolina State), and Johann Grünloh (Virginia). These determinations demonstrate the NCAA's willingness to permit participation by athletes who accumulated meaningful professional basketball experience before entering NCAA Division I competition.

75. The NCAA has extended similar relief on an individualized basis. Ilias Kamardine competed professionally in France before enrolling at the University of Mississippi. The NCAA initially determined that Kamardine possessed one remaining season of eligibility. The NCAA subsequently approved a waiver granting him an additional season of Division I eligibility. The Kamardine determination demonstrates the NCAA's willingness to exercise discretionary authority to provide additional eligibility relief when it deems such relief appropriate.

76. Taken together, these decisions show that the NCAA does not use a single measure of prior basketball experience when determining eligibility. They also show that individualized relief is administratively feasible. That history bears directly on the NCAA's anticipated arguments concerning competitive balance, amateurism, and the character of the collegiate product, and on whether less restrictive alternatives are available here.

**The NCAA's Arbitrary and Anticompetitive Application**

77. The NCAA's application of its seasons limit and waiver authority excludes Plaintiffs while comparable or greater relief has been afforded through COVID waivers, redshirts, medical waivers, prior blanket relief, sport-specific rules, the new five-season framework, and individualized eligibility determinations. Plaintiffs sit between groups receiving broader treatment: athletes before them competed for a fifth or later season through COVID relief, while many athletes after them will receive five seasons under the new model.

78. The challenged restraints prevent Plaintiffs from competing for roster positions, scholarships, NIL agreements, institutional revenue sharing, and professional exposure even though they are within their eligibility clock.

79. The restraints reduce the number of qualified athletes available to NCAA Division I institutions, eliminate institutional choice concerning Plaintiffs, and suppress the compensation and opportunities that competition for their services would otherwise generate.

80. The NCAA's asserted educational rationale is weak at best as to Plaintiff Buchanan because he seeks a graduate degree, and as applied to Plaintiff Lorient because he graduated from WVU and because both are within their five (5) year eligibility clocks. Allowing both Plaintiffs to continue their education and compete advances, rather than undermines, the NCAA's stated academic purpose is within the recently adopted age-based eligibility model and is consistent with past practices of the NCAA and their stated purpose.

81. The NCAA's asserted experience rationale is weak as applied to Plaintiff Lorient because the disputed season involved only approximately seventy-four (74) minutes and because comparable or greater experience has been accommodated through NCAA exceptions and relief. Treating minimal uncompensated freshman minutes as a full season while treating extensive pre-

enrollment professional play differently demonstrates that the NCAA does not apply a neutral measure of basketball experience.

82. A federal district court recently granted a temporary restraining order to NCAA Division I athletes challenging the NCAA's exclusion of the 2025–26 transition cohort from the new five-season eligibility model. Although that decision is not binding here and remains subject to appellate review, it confirms that transition relief is administrable and may be granted without extending an athlete's existing five-year eligibility period. *See Wisne v. National Collegiate Athletic Association*, No. 1:26-cv-03063-CNS-KAS, ECF No. 38 (D. Colo. July 31, 2026).

83. In the *Wisne* case, the NCAA argues their basis for arbitrarily excluding the 2025/2026 student athletes from the age-based eligibility model was a concern with destabilizing sports and a belief that it would create roster chaos for member schools ECF No.32-1 at § 21. This arbitrary determination is not grounded in fact and is clearly anticompetitive by excluding otherwise eligible and available athletes from competing for roster spots, NIL, revenue sharing, and market exposure.

**Irreparable Harm, Equities, and Public Interest**

84. The 2026–27 season is approaching, and Division I schools must make immediate roster, aid, training, travel, NIL, and revenue-sharing decisions.

85. Once the academic year commences with student athletes not clear to compete, or the season passes, no judgment can recreate practices, games, team membership, educational support, media exposure, professional evaluation, NIL transactions, or revenue-sharing opportunities.

86. Granting the relief sought in this action will only allow Plaintiffs to compete for roster spots with schools with available roster opportunities for Plaintiffs if they are eligible.

Plaintiffs seek only the opportunity to compete for available roster positions and competition will not guarantee playing time, displace any current identified athlete, displace any currently filed roster spot, eliminate opportunities for other student athletes to compete for those roster spots, or attempt to increase roster limits.

87. The NCAA will suffer no legally cognizable harm from permitting two otherwise-qualified athletes to compete during this litigation, particularly when its own rules accommodate athletes of comparable or greater experience.

88. The public interest favors fair competition, consistent administration, educational opportunity, open courthouse doors, and meaningful judicial review of private restraints affecting interstate commerce. The public interest is not served by deterring athletes or member institutions from seeking or supporting judicial review of eligibility decisions.

**The Rule of Restitution**

89. NCAA Bylaw 12.9.4.2, commonly known as the "Rule of Restitution," authorizes the NCAA to impose sanctions when a student-athlete participates pursuant to a restraining order or injunction that is later vacated, stayed, reversed, or finally determined not to have been justified.

90. Potential sanctions include vacating wins, postseason restrictions, return or withholding of revenue, financial penalties, and other punitive measures.

91. The Rule of Restitution threatens any institution Plaintiffs would enroll in and particularly WVU with punishment for complying with an order permitting Plaintiffs to compete. That threat may deter WVU and other institutions from relying on the Court's order and would materially impair the effectiveness of any injunctive relief.

92. Plaintiffs therefore seek an injunction prohibiting the NCAA from enforcing the Rule of Restitution against Plaintiffs, WVU, WVU personnel, or other institutions competing for the services of the Plaintiffs, based on Plaintiffs' participation pursuant to an order of this Court.

93. To make any injunctive relief effective, the Court must prohibit the NCAA, and all persons acting in active concert or participation with the NCAA who receive actual notice of the Court's order, from enforcing the Rule of Restitution or imposing any other sanction against Plaintiffs, WVU, or other institutions, or their personnel, or any institution competing against or competing for the services of the Plaintiffs, based on Plaintiffs' participation pursuant to an order of this Court.

**COUNT I**
**TORTIOUS INTERFERENCE – WEST VIRGINIA UNIVERSITY**

94. Plaintiffs incorporate by reference every allegation contained in this Complaint into this Count.

95. Plaintiffs have existing or prospective contractual and economic relationships with WVU, including Plaintiff Javan's signed grant-in-aid, educational support, and both Plaintiffs potential revenue sharing, NIL opportunities, roster opportunities, training, and associated compensation.

96. The NCAA knows of those relationships and knows that eligibility controls whether they may be completed or performed.

97. The NCAA's challenged decisions intentionally interfere with those relationships by preventing WVU or any other university from independently deciding to roster, educate, support, and compensate Plaintiffs.

98. The interference is improper because, as alleged, the NCAA is not merely applying a neutral eligibility standard. It is selectively and disproportionately exercising contractual

discretion, applying exceptions and transitional relief to favored categories while withholding comparable consideration from Plaintiffs, and using collective enforcement power to prevent WVU or another institution from exercising independent educational and economic judgment.

99. To the extent the NCAA asserts a privilege to administer eligibility rules, that privilege does not extend to anticompetitive, pretextual, bad-faith, or contractually inconsistent conduct outside legitimate and proportionate rule enforcement.

100. Plaintiffs have suffered and imminently will suffer direct injury.

**COUNT II**
**TORTIOUS INTERFERENCE – NIL, REVENUE SHARING, AND PROFESSIONAL OPPORTUNITIES**

101. The Plaintiffs incorporate by reference every allegation contained in this Complaint into this Count.

102. Plaintiffs have concrete prospective business relationships arising from signed grant-in-aid, available or anticipated roster opportunities, NIL transactions, institutional revenue-sharing payments, media opportunities, and professional-development opportunities tied to active roster status.

103. The NCAA knows that eligibility directly determines whether Plaintiffs may obtain and perform those opportunities.

104. The NCAA has interfered with the relationship between the Plaintiffs and WVU, the plaintiffs and other institutions, and the expectancies of the Plaintiffs and WVU.

105. The NCAA's interference includes, but is not limited to, refusing to grant Plaintiffs a waiver when they are entitled to one, improperly and without basis or justification, arbitrarily singling out the 2025/2026 student athletes, acting arbitrary and capriciously with regard to the

Plaintiffs and their eligibility, ignoring the Plaintiffs rights, and blatantly violating the NCAA's own rules, guidelines, and past practices.

106. The challenged decisions of the NCAA intentionally prevent or impair completion and performance of those relationships.

107. The Plaintiffs have (or could have) a contractual relationship with Gold and Blue Enterprises.

108. The Plaintiffs have (or could have) contractual relationships with other third parties for use of their names, images, and likenesses.

109. The Plaintiffs expected to be prominent college athletes in the community and the nation as a whole.

110. The more prominent the Plaintiffs are as student-athletes, the more valuable those relationships become.

111. The NCAA has a duty not to tortiously and/or needlessly interfere in Plaintiffs' relationships and especially has a duty not to refuse to follow its own rules, regulations, pronouncements, bylaws, and guidelines, or to act arbitrarily and/or capriciously with regard to the Plaintiffs.

112. The interference is improper for the reasons alleged above, and Plaintiffs have suffered and imminently will suffer direct injury and damage.

113. Plaintiffs are entitled to damages for the NCAA's interference.

**COUNT III**
**BREACH OF CONTRACT – INTENDED THIRD-PARTY BENEFICIARIES AND IMPLIED COVENANT**

114. The Plaintiffs incorporate by reference every allegation contained in this Complaint into this Count.

115. The NCAA Constitution and Division I Manual, including the bylaws adopted and enforced by the NCAA's members, form part of the contractual framework governing the relationship between the NCAA and its member institutions, including WVU. To the extent additional membership agreements govern that relationship, those agreements are within the NCAA's possession or control.

116. Those governing documents expressly regulate student-athlete eligibility, welfare, education, financial aid, institutional benefits, NIL compensation, governance participation, and access to relief procedures. Constitution Article 1-A expressly concerns the primacy of the student-athlete's academic experience; Article 1-D directs the Association and its members to protect, support, and enhance student-athlete well-being; Article 2-E gives student-athletes voting representation in NCAA governance; Bylaw 14.6 governs postgraduate participation; Bylaw 16.13 authorizes institutional benefits; and Article 22 authorizes NIL compensation. Recognition of athlete-beneficiary rights in these athlete-directed provisions is appropriate to effectuate the parties expressed intent to provide and administer those benefits for the student-athlete constituency. Plaintiffs therefore allege that they are intended, rather than merely incidental, beneficiaries of the provisions adopted specifically for student-athletes' protection and benefit.

117. Because Plaintiffs assert rights as intended third-party beneficiaries, they also invoke the implied covenant of good faith and fair dealing as part of the performance and enforcement of the same contractual framework. The implied covenant does not create independent duties or alter the written terms. It requires the NCAA to exercise discretion conferred by those terms honestly and consistently with their express purposes and prohibits use of contractual discretion to deprive intended beneficiaries of the agreement's promised benefits.

118. Breach One: the NCAA violated the express commitments in Constitution Articles 1-A, 1-C, 1-D, and 4-A to academic primacy, fairness, honesty, athlete well-being, fair procedures, proportionality, and timely administration by denying Plaintiffs relief while extending comparable or greater competitive opportunities to athletes through COVID relief, redshirts, medical waivers, non-NCAA relief, the new five-season model, and individualized decisions.

119. Breach Two: Bad-Faith Exercise of Contractually Conferred Discretion. The Manual establishes procedures through which an institution may seek review and relief from the application of NCAA legislation, including the legislative-relief process described in Bylaw 9.3.1.3 and the reinstatement and waiver provisions contained in Article 12. WVU invoked the applicable relief procedures on Plaintiffs' behalf. The NCAA denied Plaintiffs requests while exercising discretionary authority to afford relief in other eligibility circumstances. Plaintiffs allege that the NCAA did not exercise its discretion consistently with the purposes, standards, and athlete-directed protections contained in the governing documents.

120. Breach Three: Disproportionate and Selective Administration of the Former Seasons Framework. Former Bylaw 12.6 limited student-athletes to four seasons of intercollegiate competition, and former Bylaw 12.6.3.1 ordinarily treated any intercollegiate competition, regardless of time, as an entire season. The NCAA relies on those former provisions to count NAIA participation and approximately seventy-four minutes of freshman participation as complete seasons. Yet the former framework contained numerous exceptions, sport-specific thresholds, hardship provisions, blanket waivers, and individualized forms of relief, and the NCAA then eliminated the seasons-of-competition limit in amended Bylaw 12.6. The NCAA's refusal to provide proportionate transition relief deprives Plaintiffs of educational, athletic, and economic benefits tied to active eligibility.

121. The NCAA's conduct frustrates Plaintiffs' justified expectations and threatens educational, athletic, and economic benefits governed by the contractual framework. Bylaw 16.13.1 authorizes participating institutions to provide direct payments, benefits, and expenses subject to the applicable benefits cap. Article 22 permits NIL compensation, including compensation based in whole or in part on athletic skill or reputation, and Bylaw 22.1.1 authorizes specified institutional licensing and endorsement agreements for a period not exceeding the student-athlete's period of eligibility. By excluding Plaintiffs, the NCAA prevents or materially impairs access to institutional benefits and diminishes the active-roster status, exposure, and athletic reputation on which NIL opportunities depend.

122. The NCAA's breaches have caused and imminently threaten educational, athletic, and economic injury to Plaintiffs for which final relief after the 2026–27 season would be inadequate.

123. Plaintiffs are entitled to declaratory, preliminary, permanent, and other appropriate relief.

## COUNT IV
## PROMISSORY ESTOPPEL – PLEADED IN THE ALTERNATIVE

124. The Plaintiffs incorporate the preceding paragraphs and plead this Count in the alternative to Count III.

125. Through its Constitution, Division I Manual, eligibility procedures, waiver mechanisms, and authorized communications, the NCAA represented that eligibility, and discretionary relief would be administered according to published standards and in good faith.

126. The NCAA should reasonably have expected student-athletes to rely on those representations in structuring educational, athletic, transfer, and professional decisions.

127. Plaintiffs structured their collegiate pathways in reliance on the NCAA's eligibility system and the availability of genuine, consistently administered relief.

128. Plaintiffs will suffer injustice absent equitable enforcement preventing selective and arbitrary administration.

**COUNT V**
**UNREASONABLE RESTRAINT OF TRADE – SHERMAN ACT § 1,**
**FULL RULE OF REASON**

129. Plaintiffs incorporate by reference every allegation contained in this Complaint into this Count.

130. Section 1 of the Sherman Act prohibits every contract, combination or conspiracy that unreasonably restrains interstate trade or commerce. 15 U.S.C. § 1.

131. The NCAA and its member institutions are separate economic actors with distinct and potentially competing economic interests. Among other matters, Division I institutions compete against one another to recruit, roster, retain, educate, train, and compensate men's basketball players.

132. Through NCAA legislation, member voting, committee action, adoption of the Division I Manual, waiver and legislative-relief procedures, and uniform enforcement mechanisms, the NCAA and its Division I members have entered into and implemented agreements governing the number of seasons during which athletes may provide Division I basketball services and the circumstances under which exceptions, waivers, or other eligibility relief will be granted.

133. The challenged restraints include agreements among the NCAA and its member institutions to count participation at non-NCAA collegiate institutions against the seasons available under former Bylaw 12.6; to treat any amount of intercollegiate basketball participation as an entire

season under former Bylaw 12.6.3.1; to deny Plaintiffs meaningful and proportionate relief through the former waiver, reinstatement, and legislative-relief framework; and to exclude Plaintiffs and similarly situated athletes whose fourth season occurred in 2025-26 from the benefit of amended Bylaw 12.6, even though they remain within existing five-year eligibility periods and additional requirements of amended Bylaw 12.6.

134. These restraints constitute concerted action because the NCAA's eligibility rules, waivers, framework, and enforcement mechanisms reflect collective action within the NCAA's governance structure and impose uniform eligibility determinations governing athletes' access to the Division I men's basketball labor market.

135. In the absence of the challenged agreements, NCAA Division I institutions would be free to determine independently whether to recruit, roster, provide athletic aid to, train, compensate, and obtain the basketball services of Plaintiffs during the 2026-2027 academic year, subject to lawful and substantially less restrictive eligibility requirements.

136. The challenged agreements regulate commercial activity. Eligibility determines whether Plaintiffs may supply NCAA Division I men's basketball services and whether institutions may compete for those services through roster opportunities, athletic aid, institutional revenue-sharing payments, NIL agreements, educational benefits, coaching, training, facilities, media exposure, and professional development opportunities.

137. The challenged restraints substantially affect interstate trade and commerce. Division I institutions recruit and compete for men's basketball players throughout the United States; teams and athletes travel across state lines; games are broadcast and streamed nationally; and athletic-aid; NIL, institutional benefit, sponsorship, media, and revenue sharing transactions cross state lines.

138. The relevant product market is the labor market for the athletic services of NCAA Division I men's basketball players. NCAA Division I institutions act as purchasers of those services and compete with one another by offering athletes a combination of roster positions, athletic aid, institutional revenue sharing payments, NIL opportunities, education, coaching, training, facilities, national exposure, and professional development opportunities.

139. From the perspective of athletes supplying elite men's basketball services, participation in lower NCAA divisions, the NAIA, junior colleges, or professional leagues is not reasonably interchangeable with Division I men's basketball. Those alternatives do not offer the same combination of elite collegiate competition, undergraduate or graduate education, athletic aid, institutional revenue sharing, NIL opportunities, nationally televised competition, campus based training, high level coaching, and access to professional scouting.

140. The relevant geographic market is nationwide. Division I institutions recruit athletes throughout the United States, Plaintiffs may receive and consider opportunities from institutions in multiple states, and institutions located throughout the country compete for the services of Division I men's basketball players.

141. The NCAA and its Division I members possess substantial buyer-side market power in the relevant market. Collectively, they control access to substantially all Division I men's basketball roster positions and to the distinctive package of athletic, educational, and economic opportunities associated with those positions. No individual NCAA Division I institution may disregard the challenged restraints and compete independently for an athlete whom the NCAA has declared ineligible without exposing itself, its personnel, and potentially other athletes to sanctions.

142. The NCAA's buyer-side market power is also demonstrated by its ability to impose uniform eligibility restrictions across the relevant market without losing member institutions or

materially diminishing its control over NCAA Division I men's basketball. Plaintiffs cannot avoid the restrictions by offering their services to another NCAA Division I Institution because every competing institution is bound by the same restraints.

143. The challenged restraints have substantial anticompetitive effects in the relevant market because they exclude otherwise qualified athletes from supplying NCAA Division I men's basketball services, prevent institutions from competing for Plaintiffs' services, reduce the available supply and output of qualified athlete labor, eliminate independent institutional decision making concerning Plaintiffs, suppress the athletic aid, NIL compensation, institutional revenue sharing payments, and other benefits that competition for Plaintiffs' services would otherwise produce, reduce athlete and institutional choice, and foreclose Plaintiffs from the unique educational, athletic, and economic opportunities tied to active NCAA Division I eligibility.

144. The competitive effects are direct rather than speculative. WVU and other NCAA Division I institutions cannot lawfully roster or obtain Plaintiffs' basketball services while the challenged determinations remain in effect, and Plaintiffs cannot offer those services to any Division I institution subject to the NCAA's uniform enforcement system.

145. The NCAA's restraints place Plaintiffs in the transition group denied competitive opportunities afforded to surrounding groups. Many athletes preceding Plaintiffs received fifth or later seasons through COVID-related relief and other exceptions, while qualifying athletes governed by amended Bylaw 12.6 may compete throughout the continuous five-year period. Plaintiffs are denied comparable treatment despite remaining within their five-year eligibility periods.

146. The exclusion is anticompetitive as applied to Plaintiffs because neither Plaintiff seeks an enlargement of the five-year eligibility period. Plaintiffs seek only the opportunity to

supply basketball services during the fifth year of the period the NCAA already recognizes as the permissible window for collegiate competition.

147. For Plaintiff Buchanan, the restraint counts two seasons of competition at an NAIA institution that was not an NCAA Division I member and was not governed by the NCAA's Division I competitive or compensation system. The resulting exclusion penalizes participation outside the NCAA system and forecloses NCAA Division I Institutions from competing for Buchanan's services during an otherwise available fifth year. But for the arbitrary and capricious application of the 2025/2026 exclusion, Plaintiff Buchanan would be clearly eligible under the age based eligibility rule adopted by the NCAA.

148. As applied to Plaintiff Lorient, the restraint converts approximately seventy-four minutes of primarily developmental freshman participation into an entire season of competition, without a proportionate assessment of the athletic services actually supplied during that season. Seventy four minutes in the eyes of the NCAA, is equal to a full season which includes not less than one thousand two hundred forty minutes of competition. The resulting exclusion prevents Division I institutions from competing for Lorient's services during an otherwise available fifth year.

149. Plaintiffs challenge the restraints under the full rule of reason and do not rely on per se or abbreviated quick-look treatment. As alleged above, the NCAA and its members possess substantial buyer-side power in the relevant market, the challenged restraints produce substantial anticompetitive effects, and any cognizable procompetitive objective may be achieved through substantially less restrictive alternatives.

150. Any asserted interest in preventing indefinite or prolonged eligibility cannot justify the challenged restraints as applied to Plaintiffs because neither Plaintiff seeks an extension of his

five-year eligibility period. Plaintiffs seek only to compete for one additional season during the fifth and final year of their existing eligibility periods, the same eligibility period as adopted by the NCAA to be effective as of August 3, 2026. Granting that relief would preserve the NCAA's five-year time limit while allowing Plaintiffs to compete for a fifth season within that limit.

151. Any asserted interest in preserving competitive balance, limiting accumulated experience, or maintaining a distinct collegiate product is weakened by the NCAA's own rules and practices. Amended Bylaw 12.6 permits qualifying athletes to compete throughout a continuous five-year period; the former framework granted fifth or later seasons through COVID relief and other waivers and contained sport-specific thresholds, hardship relief, and individualized determinations; and the NCAA permits athletes with substantial prior professional or international experience to compete in NCAA Division I.

152. The NCAA's own rules demonstrate that competition during the fifth year of a five-year eligibility period is compatible with Division I basketball, educational opportunity, competitive balance, athlete welfare, and the collegiate product. Excluding Plaintiffs and similarly situated members of the 2025-26 transition group is therefore not reasonably necessary to obtain any cognizable procompetitive benefit.

153. Any legitimate procompetitive interest asserted by the NCAA can be achieved through substantially less restrictive alternatives, including fair and individualized eligibility review, without excluding Plaintiffs from competition during their existing five-year eligibility periods.

154. Those alternatives are practical and administrable because the NCAA administered sport-specific exceptions, hardship rules, waivers, reinstatement procedures, individualized

determinations, and blanket relief under the former framework and now administers individualized eligibility certification under amended Bylaw 12.6.

155. Plaintiffs have suffered and face imminent antitrust injury arising directly from the challenged restraints' suppression of competition in the Division I men's basketball labor market. By preventing NCAA Division I institutions from independently competing for Plaintiffs' basketball services, the restraints exclude Plaintiffs from the competitive process for roster positions, athletic aid, NIL agreements, institutional revenue sharing payments, training, exposure, and related educational and professional opportunities during the 2026-27 academic year.

156. Plaintiffs' threatened injuries are immediate and irreparable. Once roster, enrollment, aid, training, travel, NIL, revenue-sharing, and competition opportunities for the 2026-27 season pass, they cannot be recreated through a later judgment.

157. Plaintiffs are threatened with loss or damage from a violation of the federal antitrust laws and are entitled to declaratory and temporary, preliminary, and permanent injunctive relief under Section 16 of the Clayton Act 15 U.S.C. § 26.

158. To the extent Plaintiffs seek monetary recovery for injuries caused by the challenged restraints, Plaintiffs are also entitled to recover damages, costs, and reasonable attorneys' fees under Section 4 of the Clayton Act, 15 U.S.C. § 15.

**COUNT VI**

**CONTRACT AND COMBINATION IN RESTRAINT OF TRADE – WEST VIRGINIA CODE § 47-18-3**

159. Plaintiffs incorporate by reference every allegation contained in this Complaint into this Count.

160. The NCAA is formed and governed through agreements among member institutions and conferences.

161. The challenged agreements and their enforcement unreasonably restrain competition in the labor market for Division I men's basketball services, including within West Virginia.

162. The challenged conduct prevents qualified athletes from competing, restricts institutional choice, and impairs athletic aid, NIL, revenue-sharing, and professional opportunities.

163. The West Virginia Code § 47-18-3(a) provides that every contract, combination, or conspiracy in restraint of trade or commerce in West Virginia is unlawful. The NCAA's challenged agreements and enforcement violate § 47-18-3, and Plaintiffs are entitled to appropriate declaratory and injunctive relief.

**COUNT VII**
**DECLARATORY JUDGMENT**

164. Plaintiffs incorporates by reference every allegation contained in this Complaint into this Count.

165. An actual and immediate controversy exists because the NCAA treats Plaintiffs as ineligible for 2026–27 and Plaintiffs contend enforcement is unlawful as applied.

166. Under 28 U.S.C. §§ 2201 and 2202, Plaintiffs seek declarations that the NCAA may not enforce the challenged rules and waiver decisions to bar them from competing during 2026–27 academic year and may not invoke the Rule of Restitution based on participation under this Court's order.

167. For the reasons stated herein, the Plaintiffs ask this Court to judge, hold, and declare that they have an economic right to market and license their name, image, and likeness.

168. For the reasons stated above, Plaintiffs ask this court to judge, hold, and declare that they have a right to play college basketball and that they are eligible to compete in NCAA-sanctioned sporting events.

169. For the reasons stated above, Plaintiffs ask this court to judge, hold, and declare that they have a right to be treated fairly by the NCAA, and they have a right to rational, fair, and equitable decisions by the NCAA when applying its rules, regulations, bylaws, and guidelines to them.

**COUNT VIII**
**TEMPORARY, PRELIMINARY, AND PERMANENT INJUNCTIVE RELIEF**

170. Plaintiffs incorporates by reference every allegation contained in this Complaint into this Count.

171. Plaintiffs seek mandatory preliminary relief and therefore make a clear showing under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), and *Robinson v. NCAA*, 172 F.4th 271 (4th Cir. 2026). The requested relief preserves a meaningful opportunity to compete for existing roster positions while the merits are adjudicated.

172. Plaintiffs are likely to succeed under the complete rule of reason and on their alternative contract-based claims.

173. Plaintiffs face irreparable harm because each day of delay threatens unique roster, aid, training, NIL, revenue-sharing, educational, competitive, and professional opportunities that cannot be recreated after the season.

174. The balance of equities favors relief because Plaintiffs seek no additional roster spots and no guaranteed playing time, while denial permanently destroys the season. The public interest favors fair competition, equitable treatment, educational opportunity, and access to courts.

175. By unfairly, arbitrarily, and improperly applying its eligibility rules, NCAA is also irreparably harming Plaintiffs' chances at playing professionally.

176. For these reasons Plaintiffs also seek an injunction from this Court enjoining the NCAA from enforcing its rules, regulations, and/or bylaws that prevent Plaintiffs from immediately playing college basketball.

177. For these reasons, Plaintiffs also seek a ruling by this court that The Rule of Restitution must be enjoined so that institutions may comply with any order without fear of retroactive punishment.

178. Under Federal Rule of Civil Procedure 65(c), the Court should waive security or, alternatively, set security at a nominal amount not exceeding $100 because the requested relief will not require the NCAA to make any payment, increase any roster limit, or incur any identifiable monetary loss or recoverable damages.

WHEREFORE, Plaintiffs respectfully demand the following:

1. Enter temporary, preliminary, and permanent relief enjoining the NCAA and all persons bound under Federal Rule of Civil Procedure 65(d)(2) from enforcing the challenged seasons-of-competition rules or waiver decisions to prevent Plaintiffs from enrolling, receiving aid, being rostered, receiving permitted compensation, training, or competing for WVU during 2026–27, and from enforcing any transfer-portal or related administrative deadline to the extent Plaintiffs reasonably failed to satisfy it while treated as ineligible;
2. Declare that enforcement of the challenged rules and waiver decisions against Plaintiffs is unlawful as applied;
3. Enjoin enforcement of the Rule of Restitution and any sanction against Plaintiffs, WVU, personnel, or other institutions based on Plaintiffs' participation pursuant to this Court's order;

4. Enjoin Defendant NCAA from preventing, restricting, delaying, or otherwise interfering with Plaintiffs' entry into, participation in, or use of the NCAA Transfer Portal should either Plaintiff elect to transfer to another NCAA Division I member institution for the purpose of utilizing the eligibility recognized by an Order of this Court;
5. Award all damages due the Plaintiffs from the Defendant NCAA's conduct;
6. Award treble damages pursuant to 15 U.S.C. § 15;
7. Award costs and reasonable attorneys' fees to the extent authorized by law;
8. Waive security under Federal Rule of Civil Procedure 65(c), or alternatively set security at a nominal amount, because the requested relief will not cause the NCAA any identifiable monetary loss or recoverable damages.
9. Grant all other relief as the court may deem just and equitable.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

JAVAN BUCHANAN AND BRENEN LORIENT,
BY COUNSEL,

s/ Devon J. Stewart

August 3, 2026

Devon Stewart (W. Va. Bar No. 11712)
James A. Gianola (W. Va. Bar No. 1378)
David M. Jecklin (W.Va. Bar No. 9678)
Bradford J. Deitzler (W.Va. Bar No. 13605)
Lewis Gianola LLC
1714 Mileground
Morgantown, WV 26505
(304) 291-6300
dstewart@lewisgianola.com
jgianola@lewisgianola.com
bdeitzler@lewisgianola.com
djecklin@lewisgianola.com