**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Clarksburg**

**BRENEN LORIENT,**
**JAVAN BUCHANAN,**
**JASON CHAMBERS,** and
**BENJAMIN MCDOUGAL,**

Plaintiffs,

v. **CIVIL ACTION NO. 1:26-CV-94**
Judge Bailey

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,**

Defendant.

**MEMORANDUM OPINION AND ORDER**

Before addressing the merits of the above-styled case, the Court would be remiss if it did not offer its two cents regarding the increasingly complicated world of college athletics. The undersigned has now presided over two (2) cases involving West Virginia University ("WVU") student-athletes seeking injunctive relief to permit them to participate in collegiate sports. *See* ***Battle v. NCAA***, Civil Action No. 1:23-CV-101 and ***Robinson v. NCAA***, 1:25-CV-75. The Court has also presided over litigation in which the States of Ohio, Colorado, Illinois, New York, North Carolina, Tennessee, West Virginia, Minnesota, and Mississippi, the Commonwealth of Virginia, and the United States of America sought to enjoin enforcement of National Collegiate Athletic Association ("NCAA") Bylaw 14.5.5.1, commonly known as the "Transfer Eligibility Rule." *See* ***Ohio v. NCAA***, Civil Action No. 1:23-CV-100. While the Court has no doubt that the federal judiciary is capable of

adjudicating the cases that come before it, these cases have brought into sharp focus a troubling feature of the current system: student-athletes are increasingly required to seek relief from individual district courts, sometimes on expedited schedules, with the possibility that similarly situated athletes may receive different answers depending upon the court in which their case happens to be filed.[1]

The consequences of such a system extend beyond the parties and the courts themselves. A student-athlete visiting a university as part of the recruiting process should be considering the institution's academic programs, coaching staff, facilities, campus, and opportunities for competition—not whether a particular federal district court has previously been receptive to claims involving NCAA eligibility rules. Yet, under the current system, the location of a university, or even the happenstance of which judge is assigned a case, may affect whether an athlete is permitted to compete. That creates the unfortunate possibility that judicial outcomes could become another factor in the recruiting process and could provide certain universities with an advantage unrelated to the merits of their institutions or athletic programs.

The Court recognizes that these cases present difficult and evolving questions involving antitrust law, student-athlete eligibility, collegiate competition, and the authority

---

[1]With Judge Sweeney's July 31, 2026 Order in ***Wisne et al. v. National Collegiate Athletic Association***, 2026 WL 2214234 (D. Colo. July 31, 2026), *opinion clarified* 2026 WL 2214320 (D. Colo. Aug. 2, 2026), having been stayed by the Tenth Circuit, numerous student-athletes who had relied upon the nationwide relief afforded by that decision were effectively left with no alternative but to seek individualized relief in the courts where their respective universities are located. As a result, student-athletes facing the same eligibility issue are now being required to pursue separate litigation in different jurisdictions, potentially subjecting similarly situated athletes to different outcomes based solely on the court in which relief is sought.

of the NCAA. The Court further recognizes that reasonable jurists may disagree about the appropriate resolution of those questions. But the present patchwork approach—where individual athletes seek emergency relief in courts across the country and different courts may reach different conclusions concerning substantially similar NCAA rules—does little to promote certainty, uniformity, or fairness. It also places courts in the unenviable position of making decisions that can have immediate and significant consequences not only for the litigants before them, but for universities, athletic programs, conferences, and student-athletes nationwide.

Additionally, Judge Kara Krothe in the Monroe County Circuit Court in Indiana issued an injunction on September 23, 2026, allowing almost 100 players to play, including, ironically, a player committed to West Virginia University.[2]

In short, the current system is a mess. College athletics has changed dramatically, while the legal and regulatory framework governing that industry has struggled to keep pace. Whatever the ultimate merits of the various challenges to NCAA eligibility rules may be, there is a compelling need for a more uniform and predictable system for resolving these disputes. That responsibility should not fall principally upon individual Judges faced with emergency motions involving athletes whose seasons, scholarships, and collegiate careers may turn on decisions that must be made in a matter of days.[3] The Court therefore

---

[2]JaCorey Thomas dressed and was available for West Virginia University's game on September 26, 2026, against Oklahoma State University.

[3]For instance, with the addition of Jason Chambers in the above-styled case, a Division I football player, the urgency of this matter has increased substantially. Division I football games began on August 27, 2026, meaning that the 2026 football season is already underway while Chambers and similarly situated student-athletes remain uncertain as to whether they will be permitted to compete. At this point, the question of eligibility is

respectfully suggests that the time has come for Congress to address the broader structure governing college athletics and provide a clear, comprehensive, and uniform framework—rather than leaving the federal courts to piece one together case by case.[4]

Turning to this case, plaintiffs seek an injunction prohibiting the NCAA from enforcing arbitrary and capricious decisions, breaching its contracts with its member institutions, and preventing them from participating in college sports. *See* [Doc. 12]. On August 18, 2026, the Court held a Status Hearing and issued deadlines for preliminary injunction briefing. *See* [Docs. 4, 10]. The Court also directed the parties to provide notice regarding any proceedings in the Tenth Circuit regarding the appeal of Judge Sweeney's July 31, 2026 Order in ***Wisne et al. v. National Collegiate Athletic Association***, 2026 WL 2214234 (D. Colo. July 31, 2026). [Doc. 10 at 1–2].

The parties filed a Joint Status Report on September 1, 2026. *See* [Doc. 11]. The parties report that, on August 21, 2026, the Tenth Circuit stayed the nationwide preliminary injunction entered in ***Wisne***, which had restored eligibility for qualifying 2022-entry Division I student-athletes under the NCAA's "Five-for-Five" framework. [Id. at ¶¶ 1–3]. As a result of the Tenth Circuit's ruling, the nationwide injunction entered in

---

not merely academic or prospective; each passing week represents games, practices, and meaningful opportunities to participate that cannot be recovered. The circumstances therefore underscore the need for a prompt resolution of the issues presented before the Court.

The case was filed on August 3, 2026, and the Court promptly scheduled a hearing on plaintiffs' Motion for Preliminary Injunction for September 24, 2026, following expedited briefing. Thus, from the filing of the Complaint to the date by which the student-athletes must know their playing futures, the parties and the Court have had less than two (2) months to litigate and resolve issues of significant legal and practical consequence.

[4] This request for congressional action is not an endorsement of any pending legislative action.

***Wisne*** is currently not in effect and athletes whose eligibility depended solely upon the ***Wisne*** class-wide injunction are presently ineligible unless they have obtained separate relief through another court order or injunction. [Id. at ¶ 4]. The stay does not resolve the merits of the underlying antitrust claims or vacate the district court's class certification or preliminary injunction, and the appeal remains pending on an expedited schedule. [Id. at ¶ 5]. Following the stay, plaintiffs reported that at least two (2) additional similarly situated WVU student-athletes have been prevented from competing, and plaintiffs amended the Complaint to add those athletes as plaintiffs, with the parties agreeing that the existing case schedule should remain in place. [Id. at ¶ 9].[5] Separately, the NCAA has petitioned the Judicial Panel on Multidistrict Litigation ("JPML") to centralize numerous NCAA eligibility-related antitrust cases, but this action is currently identified only as a potential tag-along action and has not been transferred. [Id. at ¶¶ 10–12]. The JPML has not yet ruled on the proposed MDL, and oral argument is scheduled for September 24, 2026; therefore, the pending MDL proceedings do not presently affect this Court's schedule. [Id. at ¶¶ 14–17].

Also on September 1, 2026, plaintiffs filed their Motion for Preliminary Injunction and accompanying Memorandum of Law in Support. *See* [Docs. 13 & 16]. On September 15, 2026, the NCAA filed a Response [Doc. 22]. Plaintiffs filed a Reply [Doc. 23] on September 22, 2026. For the reasons that follow, this Court will **GRANT** plaintiffs' request for a preliminary injunction.

---

[5]Plaintiffs filed an Amended Complaint and added the two (2) additional athletes: Jason Chambers (football) and Benjamin McDougal (baseball). [Doc. 12].

## I. Background

The NCAA is the governing body for college sports in the United States. [Doc. 12 at ¶ 59 ("The NCAA is a voluntary, self-governing association of colleges, universities, and conferences that regulate intercollegiate sports, including eligibility and participation.")]. NCAA member institutions must agree to comply with NCAA rules and enforcement mechanisms as a condition of membership and competition. [Id. at ¶ 60].

For decades, the NCAA's "Five-Year Rule" has permitted student-athletes to compete in up to four (4) seasons of intercollegiate athletic competition over a five (5)-year period. [Doc. 22-1 at 58–68]. The NCAA's eligibility rules also provide various means for member institutions to obtain "waivers" of the Five-Year Rule on student-athletes' behalf. [Id. at 60, 65–68]. These waivers permit student-athletes to either obtain an additional season of eligibility to participate in competition and/or an extension of their five (5)-year eligibility clock under defined circumstances. [Id.].

But in June 2026, the NCAA changed course. Under the "new age-based eligibility model," which plaintiffs call the "Five for Five Rule,"

> An individual's[6] period of eligibility for practice and competition shall be limited to five years. An individual's five-year period of eligibility begins with the earlier of the following:

---

[6]NCAA Bylaw 12.01.2 states:

> **"Individual" vs. "Student-Athlete."** NCAA eligibility may be lost as a result of activities before enrollment in college. If NCAA rules specify that an "individual" may or may not participate in certain activities, this term refers to a person before and after enrollment in a member institution. If NCAA rules specify a "student-athlete," the legislation applies only to that person's activities after enrollment.

[Doc. 13-3 at 14].

(a) The regular academic term (semester or quarter) of an academic year in which the individual enrolls in a collegiate institution (domestic or foreign; see Bylaw 14.02.4) in a minimum full-time program of studies and attends a class in that term while enrolled full time; or

(b) The beginning of the regular academic year immediately after the individual's 19th birthday.

[Doc. 13-3 at 25–26]. Waivers are no longer available for injury, illness, family emergencies, or economic hardship. The "exceptions" are now limited to military service, recognized foreign aid services such as the Peace Corps, conscientious objectors, and official religious missions under Rule 12.6.6, and pregnancy under Rule 12.6.7. [Doc. 16 at 6 (citing [Doc. 13-3 at 26–27])].

In this case, plaintiffs are four (4) athletes who have each competed in four (4) seasons of collegiate sports, most recently competing at West Virginia University. They seek to compete in a fifth season while enrolled as full-time students during their fifth year of college.

In June 2026, the NCAA Division I Cabinet adopted a new rule that would allow some athletes to do just this—play five (5) seasons within a student-athlete's five (5)-year period of full-time enrollment. [Doc. 22-2 at ¶ 16]. Going forward, student-athletes will receive a five (5)-year eligibility period beginning at the start of the academic year following their 19th birthday or upon full-time enrollment at a collegiate institution, whichever comes sooner, and student-athletes may compete during that five (5)-year period of eligibility without restriction, providing they meet all other eligibility requirements. [Id. at ¶ 17].

Waivers have been eliminated under this new rule other than clearly defined cases required by law involving pregnancy, military service, and religious missions. [Id.].

For example, plaintiff Javan Buchanan's request and situation are almost identical to several waiver requests granted by the NCAA in other cases, including those of Ben Humrichous and Elijah Malone. In each of those cases, the student-athlete was granted a waiver for additional eligibility—in fact, the student-athletes in those cases were awarded years of eligibility in excess of what is being requested by Buchanan here. In the Ben Humrichous situation, he participated for two (2) years at the National Association of Intercollegiate Athletics ("NAIA") level and then three (3) additional years at the Division I level. Elijah Malone spent four (4) years at the NAIA level and then participated two (2) additional years at the Division I level. Notably, in the Elijah Malone case, his waiver required not only an eligibility waiver but a five-year clock waiver. Buchanan's requested waiver to the NCAA here is much simpler and more limited but was denied nonetheless by the NCAA.

But plaintiffs, due to the timing of when they were born, high school graduation, and number of seasons in which they have already competed, are not allowed to compete for a fifth year under this rule. In other words, plaintiffs are caught in the gap between the old regime and the new regime of eligibility rules. Plaintiffs seek injunctive relief because implementation of this rule wrongfully denies them the opportunity to compete in a fifth season of their collegiate careers, and because this rule and the NCAA's conduct amounts to a violation of federal antitrust law.

The Five for Five Rule poses a problem for plaintiffs. While not stated in the language of the Rule itself, the Rule does not apply to athletes who began playing in 2022

and were deemed by the NCAA to have completed four (4) years of competition. Thus, plaintiffs here are ineligible to play a fifth season of college sports—despite wanting to do so—due to the NCAA's eligibility determination. This not only prohibits plaintiffs from competing in a fifth season, but also denies them the "right to compete for revenue sharing, NIL opportunities, training, exposure, and professional-development opportunities." [Doc. 12 at ¶ 72]. In the words of plaintiff Brenen Lorient, and a sentiment shared by the other three (3) plaintiffs, "[i]f I cannot compete during the 2026–27 season, I will lose opportunities associated with participation in Division I athletics, including training, competition, exposure, potential revenue-sharing opportunities, name, image, and likeness opportunities, and opportunities to further develop as a basketball player." [Doc. 13-4 at ¶ 22].

The NCAA reasoned that applying the Five for Five Rule "retroactively" would "destabilize rosters just ahead of the coming season by disrupting settled expectations of countless student-athletes regarding their expected roster spots and playing time next year. . . ." [Doc. 16 at 7–8 (quoting two (2) posts by NCAA News on X)]. The NCAA declined to apply the Five for Five Rule retroactively because it believed doing so "would not be in the best interest of all current and future college athletes." [Id.].

In plaintiffs' view, proper—not arbitrary—implementation of the Five for Five Rule should allow them to compete for a fifth season. Plaintiffs seek relief in the form of a preliminary injunction "to restrain the [NCAA] from enforcing against them a specific rule implementation that prohibits them from competition in Division I athletics during the 2026–27 academic year." [Doc. 13 at 1]. Specifically, plaintiffs seek equitable relief:

A. Enjoining the NCAA, its officers, agents, servants, employees, attorneys, and all persons acting in active concert or participation with it from declaring Plaintiffs ineligible for NCAA Division I competition during the 2026–27 academic year based on their prior seasons of competition or based on their exclusion from the NCAA's Five for Five eligibility framework;

B. Permitting the Players to compete for available roster positions at West Virginia University, or another NCAA Division I member institution as applicable, during the 2026–27 academic year without the NCAA treating that participation as a violation of its eligibility rules; [and]

C. Enjoining the NCAA from applying, enforcing, or threatening to enforce its Rule of Restitution, including NCAA Bylaw 12.11.4.2 or any similar rule, against Plaintiffs, West Virginia University, any other NCAA member institution, or any third party based on Plaintiffs' participation in competition pursuant to the Court's injunction.

[Doc. 13 at 4].[7] In seeking this relief, plaintiffs contend they are likely to succeed on the merits on their claims under Section 1 of the Sherman Act and West Virginia Code § 47-18-3, breach of contract, tortious interference, and contract and promissory estoppel

[7]Plaintiffs also ask to waive the requirement to give security under Federal Rule of Civil Procedure 65(c) and any other relief as necessary to prevent prejudice. [Doc. 13 at 4].

claims.[8] Plaintiffs' antitrust theory is based on allegations that the NCAA is an illegal monopsony[9] whose Five for Five Rule is an unreasonable restraint on trade. *See* [Doc. 12 at ¶¶ 181–214].

## II. Plaintiffs[10]

This Court will provide a summary of each plaintiff's collegiate career.

### 1. Brenen Lorient (Basketball)

Brenen Lorient attended Florida Atlantic University ("FAU") in 2022. [Doc. 12 at ¶ 31]; [Doc. 16 at 9]. During his freshman season, he appeared in only twenty-one (21) games and accumulated approximately seventy-four (74) total minutes[11] of playing time. [Id.]; [id.]. Plaintiffs assert Lorient's freshman season was "primarily developmental" and he was not a "meaningful contributor" in the competitive sense. [Id. at ¶ 32]; [id. at 10]. Because the NCAA counts any competition as a full season of competition unless a listed

---

[8]To obtain preliminary injunctive relief, plaintiffs bear the burden to show that they are likely to succeed on one (1) of their claims. ***Profiles, Inc. v. Bank of America Corp.***, 453 F.Supp.3d 742, 747 (D. Md. 2020) (Gallagher, J.) (citing ***Stinnie v. Holcomb***, 355 F.Supp.3d 514, 527 (W.D. Va. 2018) (Moon, J.)). Thus, the Court will only address the claim under the Sherman Act.

[9]A monopoly occurs when one seller dominates a market and has significant control over the price of a good or service. A monopsony occurs when one buyer dominates a market, giving the buyer significant power over the price it pays, such as wages in a labor market.

[10]Each plaintiff submitted a Declaration. *See* [Docs. 13-4 through 13-7].

[11]For context, a full basketball game is forty (40) minutes, so this is just under two (2) full games. A typical Division I basketball team plays an average of 31 to 33 games during the regular season, with total game counts reaching 35 to 40+ games for teams that advance to conference and national postseason tournaments. Andy Wittry, NCAA.com, *How many games are in a college basketball season? It depends*, Oct. 29, 2020, https://www.ncaa.com/news/basketball-men/article/2020-10-27/how-many-games-are-college-basketball-season (last visited Sept. 29, 2026).

exception applies, the NCAA counted Lorient's seventy-four (74) total minutes as an entire season of competition. [Id. at ¶ 33]; [id.]. Plaintiffs assert the facts demonstrate that neither Lorient nor his then-school advisors understood that this limited participation would count as a full season of competition. [Id. at ¶ 34]; [id.].

In spring 2024, FAU's head coach, Dusty May, left FAU for the University of Michigan. [Id. at ¶ 35]. Lorient then transferred to the University of North Texas. [Id.]. In 2025, North Texas's head coach, Ross Hodge, left for WVU and Lorient followed Coach Hodge to WVU. [Id. at ¶ 36]. Lorient competed for WVU during the 2025–26 season and graduated from WVU in August 2026. [Id. at ¶ 37].

Lorient then sought a waiver from the NCAA's former four-year seasons-of-competition limit to play a fifth year at WVU or another Division I institution while pursuing a master's degree; was supported in this pursuit by his former coach's, Coach Dusty May, admission that he had mishandled Lorient's playing time, but the NCAA denied the request. [Id. at ¶ 38]; [Doc. 16 at 10].

Lorient desires to pursue a master's degree and compete during the 2026–27 at WVU or another Division I institution. [Id.]. The Motion argues under the Five for Five Rule, Lorient—born on April 29 and eligible under the age-based model—would be permitted a fifth year of competition. [Id. at 11]. And under the prior rules, Lorient would be eligible for a waiver for what should have been treated as a "redshirt" freshman season. [Id.]. The Motion also states Lorient is a standout WVU basketball player who started all thirty-four (34) games last season and earned College Basketball Crown All-Tournament Team honors. [Doc. 16 at 10–11]. Before WVU, he excelled at North Texas, earning First

Team All-Conference and Sixth Man of the Year honors. [Id.]. His size, shooting ability, defensive versatility, and continued development have made him a legitimate NBA prospect, although he ultimately did not sign a professional contract. [Id.]. His return would provide WVU with significant talent and depth while making him a strong candidate for grant-in-aid, revenue sharing, and NIL opportunities. [Id.].

### 2. Javan Buchanan (Basketball)

Javan Buchanan attended Indiana Wesleyan University, a NAIA institution, for two (2) seasons before transferring to Boise State University. [Doc. 12 at ¶¶ 17–18]; [Doc. 16 at 12]. Buchanan competed in two (2) seasons at Boise State and completed his undergraduate degree in May 2026, for a total of four (4) seasons of participation in competition. [Id. at ¶ 19]; [id.].

Buchanan was accepted at WVU to pursue a master's degree while continuing his athletic career. [Id. at ¶ 20]; [id.]. The Motion argues the inequity is particularly apparent when compared to the NCAA's treatment of junior college athletes, for whom courts and the NCAA have recognized that rigid eligibility rules can unfairly disadvantage athletes who develop through alternative collegiate pathways. [Doc. 16 at 12–13]. The Motion asserts Buchanan faces the same issue because his pre-NCAA playing years are being treated as exhausting eligibility even though those years occurred outside the NCAA's direct governance. [Id. at 13]. Unlike athletes covered by the NCAA's new age-based framework or transition relief, Buchanan is denied a fifth year despite remaining within the five-year period the NCAA now recognizes as appropriate for collegiate competition. [Id.]. The Motion also notes his circumstances closely resemble cases involving Ben

Humrichous and Elijah Malone, both of whom received waivers allowing additional eligibility after competing at the NAIA level, making Buchanan's narrower waiver request particularly difficult to justify. [Id.].

### 3. Jason Chambers (Football)

Jason Chambers attended North Carolina Central University during the 2022–23 academic year. [Doc. 12 at ¶ 40]; [Doc. 16 at 14]. Chambers subsequently competed at Appalachian State University and WVU. [Id.]; [id.]. Chambers completed four (4) seasons of competition by the conclusion of the 2025–26 academic year. [Id. at ¶ 41]; [id.].

Chambers seeks only to compete during his fifth year in 2026–27, without requesting any extension, sixth year, or guaranteed benefits. [Id. at ¶ 42]; [id.]. As a 2022–23 enrollee who completed four (4) seasons by 2025–26, he seeks only the benefit of the NCAA's amended Bylaw 12.6 during the fifth year it now recognizes. [Id. at ¶ 44]; [id.].

### 4. Benjamin McDougal (Baseball)

Benjamin McDougal attended Potomac State College in 2022 before transferring to WVU. [Doc. 12 at ¶ 48]; [Doc. 16 at 15]. McDougal's 2026 season was severely limited by two (2) significant injuries, including a back injury that kept him out until late January and a flexor strain that sidelined him for nearly two (2) months. [Id. at ¶¶ 49–52]; [id.]. Although he was charged with a full season of eligibility, he appeared in only thirteen (13) games and pitched 14.1 innings, with restricted workloads even after returning. [Id. at ¶ 55–56]; [id. at 15–16]. He therefore argues that treating the injury-shortened season as

a full season of competition is arbitrary and inequitable, particularly because he remains within the NCAA's recognized five-year eligibility period. [Id. at ¶¶ 57–58]; [id.].

## III. Legal Standard

To qualify for preliminary injunctive relief, a plaintiff must establish: (1) likelihood of success on the merits; (2) likelihood of irreparable harm; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *See* ***Winter v. Natural Res. Def. Council, Inc.***, 555 U.S. 7, 20 (2008). While these factors are a balancing test, a failure to establish a likelihood of success on the merits "'is usually fatal' to a plaintiff's request for preliminary injunction." *See* ***Pavia v. NCAA***, 760 F.Supp.3d 527, 536 (M.D. Tenn. 2024) (quoting ***Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC***, 958 F.3d 532, 539 (6th Cir. 2020) (citation omitted)).

Federal Rule of Civil Procedure 65 provides

Every order granting an injunction and every restraining order must:

(A) state the reasons why it issued;

(B) state its term specifically; and

(C) describe in reasonable detail–and not by referring to the complaint or other document–the act or acts restrained or required.

## IV. Analysis

The Court will first address the parties' arguments under the ***Winter*** framework as to plaintiffs' likelihood of success on the merits and whether, absent injunctive relief, plaintiffs will suffer irreparable harm before turning to the balancing of the equities and the public interest prongs.

### A. Likelihood of Success on the Merits

While a plaintiff is required to make a clear showing that he is likely to succeed on the merits in order to obtain injunctive relief, a plaintiff is not required to establish with certainty that he will succeed on the merits. ***Pashby v. Delia***, 709 F.3d 307, 321 (4th Cir. 2013); ***Roe v. Dep't of Defense***, 947 F.3d 207, 219 (4th Cir. 2020). Indeed "'[a] district court's determination that such a showing [of likelihood of success on the merits] has been made is best understood as a prediction of a probable, but necessarily uncertain, outcome….'" ***Stinnie v. Holcomb***, 37 F.4th 977, 982 (4th Cir. 2022) (quoting ***Smyth ex rel. Smyth v. Rivero***, 282 F.3d 268, 276 (4th Cir. 2002)); ***Stinnie v. Holcomb***, 77 F.4th 200, 208 (4th Cir. 2023). Moreover, in showing a likelihood of success on the merits, a plaintiff is not required to demonstrate a likelihood of success on all claims. ***Power Balance LLC v. Power Force LLC***, 2010 WL 5174957, at *5 (C.D. Cal. Dec. 14, 2010) (Guilford, J.); *see* ***Hudson v. AFGE***, 292 F.Supp.3d 145, 153 (D. D.C. Nov. 9, 2017) (Boasberg, J.) ("the Court begins with [movant's] likelihood of success on the merits of at least one claim" [emphasis added]); *see also* ***Miller v. Garland***, 2023 WL 3692841, at *34 (E.D. Va. May 26, 2023) (Alston, Jr., J.); *see also* ***Winter***, 555 U.S. at 19 n.4 (Circuit Court's discussion limited to a single claim of plaintiff's multi-claim complaint).

Plaintiffs allege that the Five for Five Rule violates Section 1 of the Sherman Antitrust Act of 1890 ("the Sherman Act"),[12] which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or

---

[12]The Supreme Court of the United States "has already recognized that the NCAA itself *is* subject to the Sherman Act." ***Nat'l Collegiate Athletic Ass'n v. Alston***, 594 U.S. 69, 96 (2021) (emphasis in original).

commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

### 1. Commercial Restraint

Section 1 of the Sherman Act outlaws contracts "in restraint of trade or commerce." 15 U.S.C. § 1. "Restraint" means an "unreasonable," ***State Oil Co. v. Khan***, 522 U.S. 3, 10 (1997), or "undue," ***NCAA v. Alston***, 594 U.S. 69, 81 (2021), restraint. *See also* ***Ohio v. Am. Express Co.***, 585 U.S. 529, 540 (2018) (explaining "unreasonable" and "undue" are synonymous in Section 1 context). But fundamentally, Section 1 of the Sherman Act outlaws commercial restraints. *See, e.g.*, ***Robinson v. NCAA***, 172 F.4th 271, 287 (4th Cir. 2026). Thus, to meet their burden, plaintiffs must show that the challenged conduct is commercial in nature.

The NCAA concedes that the Fourth Circuit in ***Robinson*** determined that the NCAA's eligibility rules are commercial and subject to the "rule of reason" analysis used in Section 1 Sherman Act claims. *See* [Doc. 22 at 6].

As noted by the NCAA and as stated by the Fourth Circuit in ***Robinson***:

> We must review the eligibility rules based on their commercial or non-commercial nature, not the nature of the NCAA overall, because "the dispositive inquiry is whether the transaction is commercial, not whether the entity engaging in the transaction is commercial." ***Va. Vermiculite, Ltd.*** [***v. W.R. Grace & Company- Connecticut***], 156 F.3d [535,] 541 [(4th Cir. 1998)].

Review of ***NCAA v. Board of Regents of the University of Oklahoma***, 468 U.S. 85 (1984), does not clearly identify whether NCAA eligibility rules are commercial or non-commercial. See ***id.*** at 102. At most, the Court suggested NCAA eligibility rules are procompetitive, which implies that they are commercial. *See* ***id.***; *cf.* ***id.*** at 121 (White, J., dissenting) ("[T]he Court errs in treating intercollegiate athletics under the NCAA's control as a purely commercial venture in which colleges and universities participate solely, or even primarily, in the pursuit of profits."). The Court observed that the NCAA's collusive behavior is only permissible because "a certain degree of cooperation is necessary if the type of competition that [the NCAA] and its member institutions seek to market is preserved." ***Id.*** at 117 (majority opinion). It explained that horizontal restraints on competition are essential if the product of college sports is to be available at all. *See* ***id.*** at 98–105. It specifically gave the example that leagues require the joint establishment of certain rules such at the "size of the field" or the "number of players on a team." ***Id.*** at 101. Indeed, "[i]n order to preserve the character and quality of the 'product,' athletes must not be paid, must be required to attend class, and the like." ***Id.*** at 102. The Court found that these eligibility restrictions in fact "widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive." ***Id.*** To be sure, the majority in ***Board of Regents*** primarily focused on the NCAA's rules limiting universities'

broadcast rights and it contrasted the procompetitive effects of certain eligibility rules with the broadcast rules that it found in violation of antitrust laws. *See **id.*** at 98–105. But the language heavily implies that eligibility rules should be considered presumptively procompetitive. *See **id.*** at 117 ("[M]ost of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore [are] procompetitive because they enhance public interest in intercollegiate athletics.").

Almost four decades later, in ***Alston***, the Court echoed some of its prior conclusions from ***Board of Regents***. It observed that "[w]ithout some agreement among rivals—on things like how many players may be on the field or the time allotted for play—the very competitions that consumers value would not be possible." ***Alston***, 594 U.S. at 90; *see also **id.*** at 110 (Kavanaugh, J., concurring) ("Everyone agrees that the NCAA can require student athletes to be enrolled students in good standing."). But it cautioned that though some restraints are necessary, that does not mean all aspects of the interleague cooperation are. ***Id.*** at 90 (majority opinion). It noted that an abbreviated review (i.e., quick look) of restraints is appropriate for those rules "necessary to produce a game," though a fuller review (i.e., rule of reason) may be appropriate for others. *See **id.*** But it expressly rejected any suggestion that the NCAA was exempt from the Sherman Act because the

challenged restrictions "happen to fall at the intersection of higher education, sports, and money." ***Id.*** at 94.

Courts have found the question of whether eligibility rules are commercial to be a close issue in the wake of ***Alston***. On the one hand, several courts have concluded that eligibility requirements are not commercial because there is no money guaranteed from participation in Division I football. *See, e.g.*, ***Goldstein v. NCAA***, 2025 WL 662809, at *4 (M.D. Ga. Feb. 28, 2025) (describing the ***Alston*** decision as "more scalpel than ax" and concluding that the Five-Year Rule is not commercial in nature and thus not subject to antitrust scrutiny); ***Coley v. NCAA***, 792 F.Supp.3d 634, 643–44 (E.D. N.C. 2025) [(Dever, III, J.)] (same); ***Brzovic v. NCAA***, 2025 WL 1370758, at *4 (D. S.C. May 11, 2025) [(Norton, J.)] (same); ***Johnson v. NCAA***, 2025 WL 1790345, at *10 (D. Mont. June 26, 2025) (same). On the other hand, with the advent of revenue sharing and NIL compensation (sometimes facilitated by the educational institution), there is a legitimate argument that participation in college sports results in compensation such that eligibility rules are commercial and subject to review under the Sherman Act. *See, e.g.*, ***Pavia v. NCAA***, 760 F.Supp.3d 527, 537–38 (M.D. Tenn. 2024) (concluding NCAA's eligibility rules are commercial because only eligible players can negotiate NIL agreements), *appeal dismissed as moot*, 154 F.4th 407 (6th Cir. 2025); ***Braham v. NCAA***, 794 F.Supp.3d 824, 833 (D. Nev. 2025) (concluding that the post-***Alston***

collegiate athletic world means that eligibility rules are intertwined with commercial rules and benefits such that they are essentially commercial in nature), *appeal docketed*, No. 25-5040 (9th Cir. Aug. 11, 2025); ***Martinson v. NCAA***, 804 F.Supp.3d 1109, 1124–25 (D. Nev. 2025) (concluding NCAA eligibility rules are commercial because they determine the ability of Division I athletes to participate in the labor market and be compensated for their labor), *appeal docketed*, No. 25-5962 (9th Cir. Sept. 22, 2025).

We join the two courts of appeals to have considered this question post-***Alston*** in concluding that the challenged eligibility rules are subject to the Sherman Act. *See* ***Elad*** [***v. NCAA***], 160 F.4th [407,] 414–15 [(3d Cir. 2025)] (holding that ***Alston*** superseded the Third Circuit's prior precedent characterizing NCAA eligibility rules as categorically non-commercial); ***Fourqurean***, 143 F.4th at 863. The challenged eligibility rules limit college athletes' participation in a labor market. ***Elad***, 160 F.4th at 415. This restraint on labor through association rulemaking interferes with student athletes' free exercise of their rights to engage in commerce (i.e., participate in Division I football). *See* ***Anderson v. Shipowners' Ass'n of Pac. Coast***, 272 U.S. 359, 362–63 (1926) (applying section 1 of the Sherman Act to shipping associations' restrictions on seamen's access to the labor market); ***Radovich v. Nat'l Football League (NFL)***, 352 U.S. 445, 448–54 (1957) (applying section 1 to the professional football association's blacklisting of players who played football for a rival professional football conference). As

> such, we conclude the challenged eligibility rules are commercial and therefore subject to review under the Sherman Act.

172 F.4th 271, 277–290.

While ***Robinson*** dealt with a different set of challenged rules, it is even clearer that the Five for Five Rule is a horizontal restraint on commerce because it directly impairs the supply of labor from the market of Division I intercollegiate athletics by fully removing one-fifth of the entering class cohorts—just for this year—that otherwise would be eligible to participate next year, and, in effect, prior years through applicable waivers and exceptions that no longer apply.

Having established that the Five for Five Rule is commercial in nature, the "only question left is whether that restraint is an unreasonable restraint on trade." ***Elad***, 160 F.4th at 415.

### 2. Rule of Reason[13]

As laid out by the Fourth Circuit in ***Robinson***:

> Section 1 of the Sherman Act prohibits agreements "in restraint of trade or commerce." 15 U.S.C. § 1. The "[Supreme] Court has long recognized that, in view of the common law and the law in this country when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean 'undue restraint.'" ***Ohio v. Am. Express***, 585 U.S. 529, 540 (2018) (citation modified). "Determining whether a restraint is undue for purposes

[13]In the Amended Complaint, plaintiffs state they are "challeng[ing] the restraints under the full rule of reason and do not rely on per se or abbreviated quick-look treatment." [Doc. 12 at ¶ 205].

of the Sherman Act 'presumptively' calls for what we have described as a 'rule of reason analysis.'" ***Alston***, 594 U.S. at 81 (*first quoting* **Texaco Inc. v. Dagher**, 547 U.S. 1, 5 (2006); *and then quoting* **Standard Oil Co. of N.J. v. United States**, 221 U.S. 1, 60–62 (1911)). In practice, there are three avenues of analysis under section 1 of the Sherman Act that apply depending on how obviously anticompetitive the challenged conduct is: (1) per se liability, (2) quick-look scrutiny, and (3) rule of reason analysis. ***N.C. State Bd. of Dental Exam'rs v. FTC***, 717 F.3d 359, 373 (4th Cir. 2013). . . . Rule of reason analysis requires "a three-step, burden-shifting framework," [***Am. Express***, 585 U.S. at 541], whereas quick-look analysis directs courts to "undertake only a cursory examination before imposing antitrust liability," ***Texaco***, 547 U.S. at 7 n.3.

[Quick-look analysis] should be rarely applied because "[m]ost restraints challenged under the Sherman Act—including most joint venture restrictions—are subject to the rule of reason." [***Alston***, 594 U.S. at 88]; *see also* ***Robertson v. Sea Pines Real Est. Cos.***, 679 F.3d 278, 290 (4th Cir. 2012) (explaining that rule of reason traditionally applies to joint venture cooperation that has possible procompetitive justifications). In other words, "[t]he rule of reason applies if the reasonableness of a restraint cannot be determined without a thorough analysis of its net effects on competition in the relevant market." ***N.C. State Bd. of Dental Exam'rs***, 717 F.3d at 373 (citation modified).

172 F.4th at 290–91.

The Supreme Court of the United States:

> has "long recognized that in view of the common law and the law in this country when the Sherman Act was passed, the 'restraint of trade' is best read to mean 'undue restraint.'" ***Ohio v. American Express Co.***, 585 U.S. 529, 540 (2018) (brackets and some internal quotation marks omitted). Determining whether a restraint is undue for purposes of the Sherman Act "presumptively" calls for what we have described as a "rule of reason analysis." ***Texaco Inc. v. Dagher***, 547 U.S. 1, 5 (2006); ***Standard Oil Co. of N. J. v. United States***, 221 U.S. 1, 60–62 (1911). That manner of analysis generally requires a court to "conduct a fact-specific assessment of market power and market structure" to assess a challenged restraint's "actual effect on competition." ***American Express***, 585 U.S. at 541 (internal quotation marks omitted). Always, "[t]he goal is to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." ***Ibid***. (brackets and internal quotation marks omitted).

***Alston***, 594 U.S. at 81.

When analyzing a claim under Section 1 of the Sherman Act to determine whether a restraint violates the rule of reason, courts use a "three-step, burden shifting framework." ***Am. Express***, 585 U.S. at 529. Under this framework,

> the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. . . . If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. . . . If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

***Id***.

At the "inception" of any "rule-of-reason analysis," courts must "adequately define the relevant market." ***Elad***, 160 F.4th at 416. *See also* ***Am. Express***, 585 U.S. at 543 ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market."); ***Pavia v. NCAA***, 154 F.4th 407, 416 (6th Cir. 2025) ("[A]nalysis of anticompetitive and procompetitive effects—the key to many antitrust cases—relies on market definition.") (Thapar, J., concurring).

The Court will first analyze the relevant market and market definition. *See* ***Am. Express***, 585 U.S. at 543. The Court then will analyze plaintiffs' claims under the rule of reason's three (3)-step framework.

**i. Market Definition**

Plaintiffs contend that the relevant market "is the labor market for the athletic services for Division I intercollegiate athletics in which Division I men's basketball[, football and baseball are] sub-market[s]." [Doc. 12 at ¶¶ 79, 93, 101]. Plaintiffs further contend

that they have put forth sufficient evidence to support their market definition. [Doc. 16 at 23–28].

Various Circuit Courts have chastised District Courts from simply using the market definition utilized in ***Alston***,[14] citing changes in the market realities since ***Alston***. However, the relevant market has not changed with respect to eligibility—the NCAA is still the gorilla in the room. An individual can freely transfer now, but only if the NCAA says he or she is eligible. An individual can receive NIL money, but only if he or she is eligible. An individual can get revenue sharing, but only if he or she is eligibile.

The Fourth Circuit, however, finds ***Alston***'s definition to be insufficient and that more is needed.

The NCAA argues that plaintiffs do not accurately or reliably identify the relevant market and that this failure forecloses their request for injunctive relief. *See* [Doc. 22 at 8–12]. The NCAA contends that plaintiffs' expert Ted Tatos's market definition is deficient for three (3) reasons: (1) he did not perform standard economic analyses to test the market's boundaries, (2) he relies heavily on outdated pre-***Alston*** evidence that does not account for major changes in college athletics, and (3) his proposed market is overly broad because it treats all Division I athletes within a sport as competing in the same market despite significant differences in compensation, skill level, and professional opportunities. [Id.]. Defendants therefore argue that plaintiffs have not demonstrated that the NCAA

---

[14] ***Fourqurean v. NCAA***, 143 F.4th 559 (7th Cir. 2025); ***Elad v. NCAA***, 160 F.4th 407 (2025); ***Robinson v. NCAA***, 172 F.4th 271.

currently possesses the alleged monopsony power and have not met their burden of establishing a relevant market. [Id.].

***Robinson*** provides guidance:

> Indeed, in cases like this one, the rule of reason analysis requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's effect on competition. [***Am. Express***, 172 F.4th] at 541. Courts cannot properly apply this analysis without an accurate definition of the relevant market. ***Id.*** at 542–43. The relevant market is defined as "the area of effective competition," meaning "the arena within which significant substitution in consumption or production occurs." ***Id.*** (citation modified). In the labor market context, the market is comprised of those employers seen by workers as reasonably good substitutes. ***Fourqurean***, 143 F.4th at 869 (citing ***Todd v. Exxon Corp.***, 275 F.3d 191, 202 (2d Cir. 2001)). The plaintiff bears the burden of proof on the issue of the relevant product and geographic markets in an antitrust case. ***Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.***, 714 F.2d 351, 355 (4th Cir. 1983). Market definition is essentially a question of fact. ***E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.***, 637 F.3d 435, 442 (4th Cir. 2011).
>
> * * *
>
> As the Third Circuit wrote in ***Elad***, "[r]ule-of-reason analyses under Section 1 of the Sherman Act," when relying on a showing of market power, "require

a well-defined relevant market and cannot rely on antiquated market definitions accepted on different evidence and in a different posture." *See* 160 F.4th at 417; ***Queen City Pizza, Inc. v. Domino's Pizza, Inc.***, 124 F.3d 430, 436 (3d Cir. 1997) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand[ ] or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products ... the relevant market is legally insufficient.").

We are not specifying the exact quantity of evidence required for an antitrust plaintiff to meet their burden of proof to establish market definition to be granted a preliminary injunction.

172 F.4th at 294.

The inquiry, then, is twofold. Plaintiffs must first present sufficient evidence to support their proposed relevant market. ***Robinson***, 172 F.4th at 293. The Court must then make the factual findings necessary to determine whether plaintiffs have carried their burden. ***Id.*** at 294. At the preliminary-injunction stage, however, the Court need not resolve every factual dispute concerning the precise contours of the market. Rather, the question is whether plaintiffs have presented sufficient evidence from which the Court can identify the relevant arena of effective competition and proceed to assess the challenged restraints. ***Id.***

Unlike the plaintiffs in ***Robinson*** who relied on an expert affidavit pulled from another case's docket and precedent from other circuits, and unlike the plaintiffs in ***Trotter***

***v. NCAA***, Civil Action No. 3:26-0523 [Doc. 20] (S.D. W.Va. Sept. 9, 2026) (Chambers, J.), who did not disclose an expert opinion in support of their motion for preliminary injunction, plaintiffs here rely principally on the declaration of Mr. Ted Tatos, who provided a declaration specifically for the above-styled case. *See* [Doc. 16 at 23–28]; *see generally* [Doc. 13-1]. Mr. Tatos has extensively studied and written academically concerning the antitrust relevant market definition for Division I intercollegiate athletics for years. [Doc. 13-1 at ¶¶ 1–5]. He opines that other NCAA Divisions are not viable substitutes for Division I and professional leagues such as the NBA and NFL do not discipline the NCAA's monopsony power. [Id. at ¶¶ 29–49]. His declaration supports those opinions with evidence addressing the "market realities for college sports," ***Fourqurean***, 143 F.4th at 870, and that includes "cold, hard data," ***Pavia***, 154 F.4th at 417 (Thapar, J., concurring).

At the hearing, Mr. Tatos testified that if there is direct evidence of monopsony power, running the hypothetical monopolist/monopsonist test ("HMT") and Small but Significant and Non-transitory Increase in Price or Other Worsening of Terms ("SSNIPT") test superfluous. His support for this position is outlined in his declaration.

First, Mr. Tatos addresses whether other NCAA Divisions are viable substitutes for Division I. [Doc. 13-1 at ¶¶ 29–34]; *see also* [Doc. 12 at ¶ 193]. He notes, as the NCAA itself explains, Division I is "the biggest stage in college sports." [Id. at ¶ 29 (quoting https://www.ncaa.org/division-i/)]. He states Division I players make up the vast majority of rosters in the NFL, NBA, WNBA, and international games. [Id. at ¶¶ 30–32]. For example, Division I Football Bowl Subdivision players made up 92.7 percent of NFL rosters in 2025. [Id. at ¶ 30]. Mr. Tatos further states that these top athletes at Division I

institutions also frequently receive full scholarships. [Id. at ¶ 33]. By contrast, Division II provides partial scholarships with strict eligibility limits, while Division III does not allow any athletic scholarships at all. [Id. at ¶¶ 33–34]. Mr. Tatos therefore opines that these financial and eligibility differences make the lower divisions poor substitutes for Division I. [Id.]. This evidence provides support for plaintiffs' market definition arguments. *See, e.g.*, ***Le v. Zuffa, LLC***, 216 F.Supp.3d 1154, 1166 (D. Nev. 2016) ("To find whether the Plaintiffs defined a relevant market within a sport, therefore, the Court must take into consideration how athletes in their respective fields are ranked with regards to one another.").

Mr. Tatos likewise provides evidence that the Division I labor market is distinct from professional sports. [Id. at ¶¶ 35–49]; *see also* [Doc. 12 at ¶ 193]. He addresses the NCAA's contention that a recent decline in underclassmen entering the NBA draft demonstrates that college basketball now operates as a substitute for professional play, thereby weakening the NCAA's market power. [Id. at ¶ 35]. Mr. Tatos explains that this argument misinterprets draft entry data, which functions more like a job application than a guaranteed roster spot. [Id. at ¶ 36]. He notes historically that top talent only left early to escape the NCAA's strict compensation limits. [Id. at ¶ 37]. And, because the NBA has a severely restricted number of roster spots compared to the hundreds of college teams, professional leagues do not provide enough alternative positions to meaningfully discipline the NCAA's market power. [Id. at ¶¶ 39–42]. He argues the NCAA's own data concerning the probability of athletes competing in professional athletics further supports this point, indicating that only a small fraction of athletes ultimately participate in the major professional sports leagues:

**Estimated probability of competing in professional athletics**

The table below outlines the estimated percentage of NCAA athletes that move on to compete professionally in sports like baseball, basketball, football, ice hockey and lacrosse.

| | NCAA Participants | Approximate # Draft Eligible | # Draft Picks | # NCAA Drafted | % NCAA to Major Pro | % NCAA to Total Pro |
|---|---|---|---|---|---|---|
| **Baseball** | 41,580 | 9,240 | 615 | 452 | **4.9%** | – |
| **M Basketball** | 19,617 | 4,359 | 58 | 43 | **1.0%** | 21.8% |
| **W Basketball** | 16,823 | 3,738 | 36 | 30 | **0.8%** | 9.1% |
| **Football** | 83,794 | 18,621 | 257 | 257 | **1.4%** | – |
| **M Ice Hockey** | 4,558 | 1,013 | 224 | 76 | **7.5%** | – |
| **W Ice Hockey** | 3,074 | 683 | 48 | 43 | **6.3%** | – |
| **M Lacrosse** | 16,691 | 3,709 | 32 | 31 | **0.8%** | – |

***Note:*** *Major Pro is defined as being drafted into the following U.S. professional leagues: MLB, NBA, WNBA, NFL, NHL, PWHL, and PLL. NWSL and WPF were previously included, but the leagues have since discontinued their drafts. Men's soccer is not included because of the numerous professional opportunities available (e.g., MLS, USL). As additional opportunities and athlete databases become available, NCAA Research intends to expand the definition of both "Major Pro" and "Total Pro" for future iterations of this document.*

NCAA, *Probability of Competing Beyond High School*, https://www.ncaa.org/student-athletes/probability-of-competing-beyond-high-school/.

Mr. Tatos provides a succinct explanation:

> 39. Athletes cannot unilaterally choose to "go to the NBA" or another professional league. A match must occur between the individual athlete and a team that needs that athlete's skill sufficiently to pay for it. In other words, labor markets require agency on both sides of the transaction: the requirements of the worker (athlete) must match the requirements of the employer (team). This relationship contrasts with one-sided agency in product markets. Given that the consumer is willing to pay the price, a gallon of gasoline, a carton of milk, or a vacuum cleaner has no say in whether (or which) consumer purchases them. The entire decision rests with consumer. In labor markets, a match must occur.

* * *

> 43. The NCAA's own data explains why this is the case. Athletes must have sufficient skill to obtain a contract in a professional league like the NFL, NBA, and so on, just as they must have sufficient skill to participate in NCAA Division I athletics. A high school football player cannot declare that he will play for West Virginia, Indiana, Ohio State, and so on. The player must be recruited and receive an offer.
>
> 44. Recent examples evince this conclusion. Former Missouri basketball player Mark Mitchell entered the 2026 NBA draft but was not selected. However, I understand that he received lucrative offers from two top basketball programs in NCAA Division I: Kentucky and Louisville, from which he chose the former. Likewise, Seth Trimble, a former standout for the University of North Carolina basketball team, was not selected in the draft and returned for a fifth year to compete for Louisville. These examples underscore the market realities that the vast majority of athletes do not have other viable options that would discipline the restraints that the NCAA imposes. Further, the NBA-NBPA collective bargaining agreement stipulates that a player must be one year removed from his high school graduation to be eligible for the NBA draft. Thus, the vast majority of top talent entered the NCAA prior to its loosening of compensation rules and they continue to do so.

[Doc. 13-1 at ¶¶ 39, 43–44].

Mr. Tatos further opines that the data does not demonstrate that the NCAA lacks market power. Rather, he contends that players are remaining in college because recent legal changes have permitted them to receive fairer compensation. [Id. at ¶¶ 45–49]. He also notes that the NCAA continues to actively restrict athlete earnings through its Clearinghouse or specific committees, including the College Sports Commission ("CSC"). [Id.]. For example, recent data from July 2026 reveals that the CSC blocked over 1,800 Name, Image, and Likeness ("NIL") deals worth nearly $90 million, or 20% of the NIL money offered, with a heavy focus on rejecting the largest, most lucrative offers. [Id. at ¶¶ 46–47]. Mr. Tatos opines this ongoing scrutiny demonstrates that the NCAA continues to exercise substantial monopsony control over college athletic compensation. [Id. at ¶¶ 48–49].

The NCAA resists Mr. Tatos's declaration as adequate evidence, as well as the evidence that Mr. Tatos marshals in providing it. *See* [Doc. 22 at 8–12]. The NCAA argues that plaintiffs cannot establish an anticompetitive effect because Mr. Tatos's analysis fails at the threshold issue of defining the relevant market. [Id.]. Specifically, the NCAA contends that Mr. Tatos does not employ any standard methodology for defining the market, relies principally on evidence predating the significant changes in college athletics following ***Alston*** and ***House***,[15] and defines the market too broadly by treating all Division I athletes within a particular sport as participants in the same market. [Id.]. According to the NCAA, Mr. Tatos acknowledges the hypothetical-monopsonist test but does not

[15] ***In re Coll. Athlete NIL Litig.***, 803 F.Supp.3d 959 (N.D. Cal. 2025), *appeal dismissed,* 2025 WL 2831020 (9th Cir. July 29, 2025) *and objections overruled*, 2025 WL 3501920 (N.D. Cal. Nov. 13, 2025).

perform it or calculate cross-price elasticities to assess substitution among available alternatives. [Id. at 8–9]. The NCAA further maintains that Mr. Tatos relies on outdated evidence of NCAA monopsony power despite recognizing the substantial changes in athlete compensation, NIL opportunities, revenue sharing, and transfer-portal mobility. [Id. at 9–10]. Finally, the NCAA argues that the proposed market obscures meaningful differences among student-athletes based on skill level, compensation, conference affiliation, and professional opportunities, including the availability of professional leagues as substitutes for certain athletes. [Id. at 10–12]. Thus, the NCAA contends that plaintiffs have not established a relevant market or demonstrated that the Five for Five Rule has an anticompetitive effect.

The Court observes that Mr. Tatos's opinion is not an isolated one; other experts have reached the same conclusion. In ***Wisne***, the NCAA criticized the plaintiffs' expert, Dr. Berri. According to the NCAA, Dr. Berri improperly "suggest[ed] that all Division I sports are part of the same market, [and therefore that] all Division I sports are interchangeable for each other." ***Wisne***, 2026 WL 2214234, at *13. The ***Wisne*** Court found that Dr. Berri did not:

> suggest all Division I sports are interchangeable. Instead, his declaration is evidence that for NCAA Division I sports the NCAA is the sole 'buyer' for all athletes in the "submarkets" of individual sports. Dr. Berri opine[d], and provide[d] evidence in support of, the proposition that Division I athletics constitute a *distinct labor market* from any other divisional (e.g., Divisions II and III) or professional counterpart (e.g. NBA or MLB) for Division I athletics.

> In other words, evidence that other divisions or associations do not constitute "good substitutes" for Division I athletics. ***Todd***, 275 F.3d at 202 (citation modified). Regardless, at this stage Plaintiffs are not required to, for instance, offer evidence about every single Division I sport's revenue or attendance for the Court to make its own findings as to the relevant market. Instead, Plaintiffs have, as they must, put forth statements from Dr. Berri that are "based on specific facts pertaining to the proposed market"—i.e., NCAA Division I athletics. ***Berlyn, Inc. v. Gazette Newspapers***, Inc., 223 F.Supp.2d 718, 727 (D. Md. 2002) [(Smalkin, C.J.)], *aff'd sub nom.* ***Berlyn Inc. v. The Gazette Newspapers, Inc.,*** 73 Fed.App'x. 576 (4th Cir. 2003).
>
> The NCAA's related observation that there are alternative markets, such as the NBA and Europeans Leagues, *see* ECF No. 32 at 14, does not undermine Dr. Berri's analysis. The point is not that there are no alternative markets. The point is that, as a function of market realities—and as a doctrinal antitrust matter—alternative markets such as professional leagues are insufficient substitutes for Division I athletics. *See, e.g.*, ***Todd***, 275 F.3d at 202; ***Fourqurean***, 143 F.4th at 869. (And they are.)

***Id.*** (footnotes omitted).

The Court agrees with plaintiffs. Plaintiffs have defined their market as the labor market for NCAA Division I intercollegiate athletics, with each athlete participating in the sport-specific submarket applicable to his or her sport. This definition identifies both the

"product market"—labor—and the "geographic market"—Division I athletics in the United States. *See* ***2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC***, 809 F.Supp.3d 371, 379 (W.D. N.C. 2025) (Bell, J.) (concluding that "geographic scope of the relevant market, which [was] the United States," satisfied market definition requirement); ***Ohio v. NCAA***, 706 F.Supp.3d 583, 592 (N.D. W.Va. 2023) (Bailey, J.). Plaintiffs also address, through Mr. Tatos's declaration and the quantitative data therein, the "reasonable interchangeability of use or the cross-elasticity of demand between" NCAA Division I athletics and divisional or professional substitutes. ***Queen City Pizza, Inc.***, 124 F.3d at 436.

The evidence likewise addresses contemporary changes in the market. Mr. Tatos's declaration provides "cold, hard data" that "grapple[s] with recent changes" in the relevant market, ***Pavia***, 154 F.4th at 417 (Thapar, J., concurring), including changes in market realities since ***Alston***, *see* ***Fourqurean***, 143 F.4th at 870. *Cf.* ***Robinson***, 172 F.4th at 295 (holding plaintiffs did not meet market definition burden of proof where they "presented no factual evidence" of market definition). Nor did Mr. Tatos "exclusively rel[y] on ***Alston*** to define the relevant market," or fail to cite "[any] market evidence or economic data" in his declaration. ***Elad***, 160 F.4th at 416. To the contrary, Mr. Tatos identifies and relies upon evidence from which he draws conclusions concerning the relevant market.

At this stage, that evidence is sufficient. It is current, empirical, and directed to whether Division I athletics has "good substitutes," ***Todd***, 275 F.3d at 202. Plaintiffs have presented evidence supporting their contention that Division I athletics lacks "commonality [or] interchangeability," ***id.***, with other NCAA Divisions or professional leagues for Division

I sports. *See also* ***Am. Express***, 585 U.S. at 543 ("The relevant market is defined as the area of effective competition. Typically, this is the arena within which significant substitution in consumption or production occurs." (citation modified)). Mr. Tatos's conclusions are bolstered by evidence of a statement made by Charlie Barker, the current NCAA president, that "98% of the 550,000 NCAA student-athletes will go pro in something other than sports," [Doc. 16 at 26], underscoring that the NCAA Division I labor market is unique. *See* ***Todd***, 275 F.3d at 205 ("Industry recognition is well established as a factor that courts consider in defining a market. It is significant because we assume that the economic actors usually have accurate perceptions of economic realities." (citation modified)). Even the NCAA's own counsel acknowledged its cartel classification economically, infamously spinning the necessary conclusion in this way: "It is a cartel that does good things, as opposed to a cartel that does bad things." [Doc. 13-1 at ¶ 20 (citing Dennis Dodd, O'Bannon trial: NCAA lawyer says it's a cartel that 'does good things', CBS Sports, June 26, 2014, available at https://www.cbssports.com/college-football/news/obannon-trial-ncaa-lawyer-says-its-a-cartel-that-does-good-things/)].

At this stage, plaintiffs are not required to, for instance, offer evidence about every single Division I sport's revenue or attendance for the Court to make its own findings as to the relevant market. Instead, plaintiffs have, as they must, put forth statements from Mr. Tatos that are "based on specific facts pertaining to the proposed market"—i.e., NCAA Division I athletics. ***Berlyn, Inc. v. Gazette Newspapers, Inc.***, 223 F.Supp.2d 718, 727

(D. Md. 2002) (Smalkin, C.J.), *aff'd sub nom.* ***Berlyn Inc. v. The Gazette Newspapers, Inc.***, 73 Fed.App'x. 576 (4th Cir. 2003).

Having considered the parties' arguments and evidentiary submissions, and consistent with the above analysis, the Court finds that, based on the preliminary injunction record, plaintiffs have met their market definition burden. *See* ***Robinson***, 172 F.4th at 294; ***Elad***, 160 F.4th at 416. The Court therefore rejects the NCAA's contention that plaintiffs have failed to define a relevant market and that their request for injunctive relief must fail on that basis. The evidence supports the existence of a defined and unique labor market for Division I athletics and demonstrates that contemporary market realities distinguish that market from other NCAA Divisions and professional leagues. Accordingly, the Court proceeds to its rule of reason analysis. *See* ***Am. Express***, 585 U.S. at 543; ***Pavia***, 154 F.4th at 416 (6th Cir. 2025) (Thapar, J., concurring).

**ii. Substantial Anticompetitive Effect**

Applying the rule of reason, plaintiffs bear the initial burden to "prove that the challenged restraint"—the Five for Five Rule—"has a substantial anticompetitive effect." ***Alston***, 594 U.S. at 96 (citation modified). *See also* ***Law v. NCAA***, 134 F.3d 1010, 1017 (10th Cir. 1998) ("A rule of reason analysis first requires a determination of whether the challenged restraint has a substantially adverse effect on competition." (citation modified)). Regarding anticompetitive effects, the "reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." ***Robinson***, 172 F.4th at 292 (citation modified)). Plaintiffs may meet their step one, anticompetitive effect burden, with indirect evidence. *See* ***Am. Express***, 585 U.S. at 542 ("Indirect evidence would be

proof of market power plus some evidence that the challenged restraint harms competition." (citation modified)).

The eligibility regulations imposed by the NCAA and its member organizations generally constitute horizontal agreements. *See* ***Business Elec. Corp. v. Sharp. Elec. Corp.***, 485 U.S. 717, 730 (1988) (explaining that horizontal agreements are agreements between competitors at the same level in a particular industry). There is no question that the NCAA and its members hold monopsony power over the labor market for college football and, therefore, have "market power." *See* ***Alston***, 594 U.S. at 109 (Kavanaugh, J., concurring) ("[The] NCAA acknowledges that it controls the market for college athletics" and "accepts that its members collectively enjoy monopsony power in the market for [college athlete services[.]").

At issue is whether plaintiffs have presented some evidence that the Five for Five Rule harms competition.

Plaintiffs argue the Five for Five Rule implementation will harm them because the Five for Five Rule "exclude[s] otherwise qualified athletes from supplying NCAA Division I men's basketball, football, and baseball services, prevent[s] institutions from competing for Plaintiffs' services, reduce[s] the available supply and output of qualified athlete labor, eliminate[s] independent institutional decision making concerning Plaintiffs, suppress[es] the athletic aid, NIL compensation, institutional revenue sharing payments, and other benefits that competition for Plaintiffs' services would otherwise produce, reduce athlete and institutional choice, and foreclose[s] Plaintiffs from the unique educational, athletic, and economic opportunities tied to active NCAA Division I eligibility." [Doc. 12 at ¶ 197].

In other words, that by excluding a defined cohort of otherwise eligible student-athletes, the NCAA is restricting competition within the labor market. Plaintiffs argue the anticompetitive effects are "direct rather than speculative. WVU and other NCAA Division I institutions cannot lawfully roster or obtain Plaintiffs' basketball, football, and baseball services while the challenged determinations remain in effect, and Plaintiffs [as well as all other individuals in the same age cohort,] cannot offer those services to any Division I institution subject to the NCAA's uniform enforcement system." [Id. at ¶ 198].

Indeed, the NCAA explains that Division I is "the biggest stage in college sports." [Doc. 13-1 at ¶ 29 (quoting NCAA.org, https://www.ncaa.org/division-i/, last accessed Aug. 30, 2026)]. Mr. Tatos agrees, concluding, "Other NCAA divisions do not exert any pricing discipline on NCAA Division I." [Id.]. This truth is intuitive and reinforced by plaintiffs' own career developments. For example, for Lorient who declared for the NBA draft—regarded by commentators as having "a clear path to NBA minutes"—the reality is that out of 4,359 NBA draft eligible NCAA participants, only 58 were selected.

Mr. Tatos's conclusions are consistent with opinions recognized by other courts, including the District of Colorado in ***Wisne***, where Dr. David Berri defined a relevant market as "the labor market for Division I college athletes." ***Wisne***, 2026 WL 2214234, at *14. Dr. Berri explained that "Division I college sports are a unique labor market [and] distinct from other college divisions, minor league professional sports, and major league professional sports," outlining substantiating market evidence concerning revenue and attendance data showing that other markets are not reasonable substitutes. ***Id***. at *11. Stated simply, the economic data confirms what is intuitive: student athletes do not have

a meaningful alternative to NCAA Division I athletics because there are no reasonable substitutes. In search of substitutes to counter-act overwhelming evidence of monopsony power, the NCAA bypasses sub-markets with less developed professional markets and focuses on the most developed pipeline for professional athletes in the United States—the National Basketball Association. In other litigation, the NCAA has argued that the "market realities" have changed following the ***House*** settlement due to its loosening of compensation restrictions on athletes. For example, the NCAA argued that in 2025–26, underclassman entered the NBA at "dramatically reduced rates." [Doc. 13-1 at ¶ 33]. As Mr. Tatos explains, however, NBA draft declaration does not mean that the player will make a roster.[16] And because economists expect labor supply elasticity to be higher at the monopsony rate, "the more talented the athlete, the greater the anticompetitive harm of the NCAA's compensation restrictions on the athlete." [Id. at ¶ 37]. In other words, with a greater restraint, more athletes "often made decisions to enter the draft, when, absent the restriction, they would have remained in college." [Id.]. But because the number of picks in the draft is fixed and unrepresentative of the market as a whole, the NCAA thus "focuses on the wrong denominator" by looking to changes in numbers declared as opposed to numbers selected. [Id. at ¶ 36].

More fundamentally, however, Mr. Tatos explains that the NCAA misconceives the proper interpretation of this development, because "this loosening of restrictions does not

---

[16][Doc. 13-1 at ¶ 27 ("In fact, anyone older than 19 who submits the correct paperwork can technically 'enter the NBA draft.'") (citing Tim Reynods, People with no chance at playing in the NBA can still enter the NBA draft, Associated Press, June 21, 2023, available at https://apnews.com/article/nba-draft-2023-eligibility-7929025cf6a221305c10a09689f3cb2b)].

indicate that the relevant market is now broader, as the NCAA erroneously concludes." [Id. at ¶ 28]. He explains succinctly, "The fact that judicial and legislative pressures have compelled the NCAA to loosen its restraints does not mean that other potential substitutes can now discipline any attempt by the NCAA to exercise market power. The question still remains: does the NCAA also need to control any other potential substitutes to restrain competition? The answer is no." [Id. at ¶ 45].

Plaintiffs are correct in that the implementation of the Five for Five Rule harms competition in the relevant market by excluding a qualified cohort—namely, 2022 high school graduates. As Mr. Tatos observes, there is no economic logic in arguing that the Five for Five Rule somehow affects the 2022–2023 class differently. [Doc. 13-1 at ¶ 52]. He states:

> In its ***Wisne*** emergency motion, the NCAA argued that "If Plaintiffs are permitted to join a roster, they will take a spot from someone else who is eligible—including those who expect to use the first of their five years under the Age-Based Eligibility Rule." I understand that this is the "substitution effect" to which the District Court in ***Wisne*** referred in its ruling. But [the] exact same "substitution effect" can apply every year after the matriculating class of 2023–2024 enters their fifth year of eligibility and will apply every year after the matriculating class of 2026–2027 enters their fifth year of eligibility, according to this same rule. In the 2027–2028 academic year, athletes who would enter their fifth year of eligibility would, by the same rule that the NCAA now calls pro-competitive and by the same argument that the

> NCAA offers above, take the a [sic] spot from someone else who is eligible and entering their first of five years under the rule.

[Id.].

Mr. Tatos also finds no rationale for why the NCAA's Five for Five Rule "mysteriously only becomes pro-competitive beginning in 2026-2027 and not a moment earlier." [Id. at ¶ 51]. Nor does the NCAA's asserted "substitution effect" supply one. The concern that fifth-year student-athletes may displace incoming freshman—and thereby create a cascading effect on later classes—misunderstands the NCAA's own rule. The same substitution effect will occur once the Five for Five Rule takes effect in 2026–27. [Id. at ¶ 52]. It is inherent to the age-based model, and it cannot be cured by forcing a single transition cohort to absorb the full loss. Indeed, the NCAA's stated concern that underclassmen may be out-competed for roster spots confirms that the challenged exclusion is designed to reduce, not promote, competition.

The Court finds it curious that the NCAA would draw a hard line excluding the Class of 2022 rather than make an exception similar to the one it made in response to the COVID-19 pandemic. When the NCAA granted an additional year of eligibility to athletes who competed during the 2020–2021 academic year because of COVID-related disruptions, the same purported "substitution effect" would have applied. Nevertheless, the NCAA chose to grant that additional year of eligibility. The question, then, is why the NCAA has taken a different approach here—effectively excluding an entire class of student-athletes based solely on the year in which they were born. These student-athletes

were, in effect, born in the wrong year. The Five for Five Rule is really the Five for Five But Not For You Rule.

This Court also finds unfairness and arbitrariness in the implementation of the Five for Five Rule as shown in the below table that was prepared by the NCAA:[17]

| **Student-athletes** | **Which eligibility rules apply** |
|---|---|
| Student-athletes who used their final season of competition (under previous rules) during 2025-26. | No additional eligibility. |
| Current student-athletes with eligibility remaining (under previous rules) after the 2025-26 academic year. | Either the previous rules OR the new age-based model, whichever is most beneficial to the student-athlete. |
| Prospects who initially enroll full time at any college or university during 2026-27. | Either the previous rules OR the new age-based model, whichever is most beneficial to the student-athlete. |
| Prospects who initially enroll full time at any college or university in fall 2027 or later. | The age-based model only. |

Under this framework, current student-athletes and new prospects can select between the previous eligibility rules or the Five for Five Rule, whichever is more beneficial to the student-athlete. The previous rules would necessarily include the waivers which were part of the old regime.[18]

With respect to plaintiffs' cohort, no eligibility, period, leading to the moniker "Five for Five But Not For You."

---

[17]Meghan Durham Wright, NCAA.org, *Division I adopts age-based eligibility model*, https://www.ncaa.org/division-i-adopts-age-based-eligibility-model/, June 23, 2026 (last visited Sept. 28, 2026).

[18]If the waivers were not included, the student-athlete would be left with a Hobson's choice — five (5) years to play four (4) seasons or five (5) years to play five (5) seasons. And it cannot mean just previous waivers since new student-athletes would not have previous waivers.

Further evidence of the unreasonable and unfair implementation of the Five for Five Rule is found in the Rule itself, which provides:

> An individual's period of eligibility for practice and competition shall be limited to five years. An individual's five-year period of eligibility begins with the earlier of the following:
>
> (a) The regular academic term (semester or quarter) of an academic year in which the individual enrolls in a collegiate institution (domestic or foreign; see Bylaw 14.02.4) in a minimum full-time program of studies and attends a class in that term while enrolled full time; or
>
> (b) The beginning of the regular academic year immediately after the individual's 19th birthday.

[Doc. 13-3 at 25–26].

Plaintiffs are individuals whose five (5) year period of eligibility began in the 2022–2023 academic year. Accordingly, the fifth academic year would be the 2026–2027 year — for which the NCAA has decreed these very athletes ineligible.

In its pronouncements, the NCAA refers to plaintiffs' cohort as "student-athletes," but the Bylaws refer to them as individuals.

There is a difference. Bylaw 12.01.2 notes the distinction providing:

> **"Individual" vs. "Student-Athlete."** NCAA eligibility may be lost as a result of activities before enrollment in college. If NCAA rules specify that an "individual" may or may not participate in certain activities, this term refers to a person before and after enrollment in a member institution. If NCAA rules

specify a "student-athlete," the legislation applies only to that person's activities after enrollment.

[Doc. 13-3 at 14].

The distinction between "individuals" and "student-athletes" is important because Rule 12.01.2 clearly designates that Article 12 Rules governing "Eligibility for Athletics Participation" will be governed by specific definitions: *individual*— "a person before and after enrollment in a member institution;" and *student-athlete*— "legislation [that] applies only to that person's activities after enrollment." This means that eligibility is extended to individuals with remaining eligibility under the age-based model, even if they are not currently enrolled (i.e., "before enrollment"). And by its own terms, the NCAA is failing to honor that agreement for individuals.

The NCAA contends that despite the clarity of Rule 12.6, plaintiffs do not qualify because they are no longer "student-athletes." The Rule, however, refers not to "student-athletes" but to "individuals."

The controversy in this case arises not out of the Rule itself, but its implementation. In a web post authored by the NCAA, the NCAA explains that "**[s]tudent-athletes** who used their final season of competition (under previous rules) during 2025–26" have "[n]o additional eligibility." [Doc. 23 at 4 (quoting Meghan Durham Wright, NCAA.org, *Division I adopts age-based eligibility model*, https://www.ncaa.org/division-i-adopts-age-based-eligibility-model/, June 23, 2026 (emphasis added))]. This breaches Rule 12.6 in two (2) critical ways:

- First, by applying the restriction to student-athletes, the NCAA takes away a fifth year of eligibility that student-athletes (who are by definition enrolled) had at the end of 2025–2026 under the prior rules.
- Second, by applying the implementation to *student-athletes*, the NCAA conflicts with Rule 12.6 that applies to *individuals*.

This Court is aware that the NCAA claims that it has universal authority to interpret the Bylaws. This Court finds, however, that the claim of such authority over a clear and unambiguous provision violates the spirit, if not the letter of ***Loper Bright Enterprises v. Raimondo***, 603 U.S. 369 (2024).

The above discussion not only confirms the unfairness and arbitrariness of the NCAA's actions, it also establishes an additional basis for finding a likelihood of success on the merits; specifically, on plaintiffs' breach of contract claim.

The NCAA claims that plaintiffs may not maintain an action for breach of contract due to a lack of standing. The NCAA contends that plaintiffs were not "sole" beneficiaries of the NCAA framework.

Plaintiffs are certainly beneficiaries. The NCAA Manual's stated purpose is not merely to regulate institutions, but to serve student-athletes. In the Preamble, the NCAA announces its member institutions' "commit[ment] to the well-being and development of student-athletes, to sound academic standards and the academic success of student-athletes, and to diversity, equity and inclusion." [Doc. 13-3 at 3]. Those purposes are carried forward in the NCAA Constitution's Article 1 "Principles" and reinforced by

structural rights that give student-athletes a voice in NCAA governance, including "voting representation on the Board of Governors" and the Division I Board of Directors. [Id. at 9].

Individually and collectively, the Division I Manual and Bylaws furnish strong evidence of the NCAA's intent to confer student-athletes with what the NCAA calls "the life-changing experience of college athletics" and the "life-changing benefits college sports provides." [Doc. 23 at 10 (quoting NCAA News, @NCAA_PR on X, https://x.com/NCAA_PR/status/2069909731364249863, last accessed Sept. 28, 2026)]. The Court reads these principles, rights, responsibilities, rules, regulations, policies, procedures, and statements all centered on giving the "gift" of college athletics as words of intention.

In ***United Dispatch, Inc. v. E.J. Albrecht Co.***, the Supreme Court of Appeals of West Virginia noted "wherein the plaintiff was one of a class of persons designated in a contract for whose benefit the contract was made; and that a member of such class could maintain an action at law, although not a party to the contract." 135 W.Va. 34, 42, 62 S.E.2d 289, 294 (1950). *See also* ***Goff v. Penn Mut. Life Ins. Co.***, 229 W.Va. 568, 729 S.E.2d 890 (2012).

In the Monroe County, Indiana case, Judge Krothe cited and relied upon a decision from the Chancery Court of Davidson County, Tennessee, which held:

> When reading the Bylaws at issue in this case, they are all largely devoted to regulating the eligibility, participation, welfare, and compensation of student-athletes. They repeatedly identify student-athletes as the objects of the Bylaws, indicating an intent to benefit them. The Bylaws are not limited

> to allocating rights and obligations among member institutions. Rather, they establish detailed rights, privileges, obligations, eligibility requirements, procedural protections, and benefits that directly govern the relationship between the NCAA and every student-athlete participating in NCAA competition. Those provisions demonstrate that student-athletes are not merely incidental beneficiaries of the contractual arrangement but are among its principal intended beneficiaries.
>
> The Court further finds it significant that student-athletes are required to review and execute acknowledgments agreeing to comply with the NCAA Bylaws before participating in athletics at NCAA member schools. (Trial Testimony of Jerry Vaughn). This requirement demonstrates that the contractual framework was intended to operate directly upon student-athletes and not merely upon member institutions. Therefore, this Court finds that the Plaintiffs are the intended beneficiaries of the contracts at issue in this case.

***Washington v NCAA***, Case No. 26-0896-III, Chancery Court of Davidson County, Tennessee, July 31, 2026 Order Granting Temporary Injunction. *See also* ***Bloom v. NCAA***, 93 P.3d 621, 623–24 (Colo. Ct. App. 2004) ("the NCAA's constitution, bylaws, and regulations evidence a clear intent to benefit student-athletes"); **Battle v. NCAA**, 2024 WL 4685604, at *5 (N.D. W. Va. Nov. 4, 2024) (Bailey, J.) (holding that student-athlete sufficiently alleged he was a third-party beneficiary to the Bylaws and Constitution of the NCAA); **Smith v. NCAA**, Case No. 2026-CP-39-00073 (S.C. Ct. C.P. June 12, 2026) (entering injunction on a claim for breach of NCAA Bylaws); ***Borovicanin v. NCAA***, Case

No. A2603352 (Ohio Ct. C.P. July 9, 2026) (order granting preliminary injunction) ("the NCAA Manual and Bylaws are clearly intended to benefit student-athletes").

This Court finds breach of contract to be another theory upon which plaintiffs have a likelihood to prevail on the merits.

The NCAA's position is particularly difficult to reconcile with its treatment of the Class of 2023, for example. One could argue that the Class of 2022 received what they bargained for when they entered college—four (4) years of eligibility. But the same reasoning applies to the Class of 2023: those student-athletes likewise entered college expecting four (4) years of eligibility. Yet, the NCAA permits the Class of 2023 to continue competing while denying the same opportunity to the Class of 2022. The distinction appears arbitrary and is difficult to reconcile with the NCAA's treatment of eligibility during the COVID-19 pandemic.

The Court is not persuaded that the NCAA has adequately explained this distinction. If the NCAA were willing to recognize an additional year of eligibility when circumstances created an overlap between otherwise eligible athletes and subsequent recruiting classes during the COVID-19 pandemic, it is not apparent why the same concern regarding a potential substitution effect warrants a different result here. At a minimum, the NCAA's explanation does not adequately account for why the Class of 2022 should bear the consequences of the asserted "substitution effect" while similarly situated student-athletes in the Class of 2023 are permitted to continue competing.

The Court therefore finds the NCAA's distinction between these two (2) classes difficult to justify on the record presently before it. Whatever legitimate concerns the NCAA may have regarding the effects of an additional year of eligibility, those concerns do not,

without more, explain why an exception was appropriate for one cohort but not the other. The NCAA's treatment of the Class of 2022, particularly when viewed in light of its prior decision to grant additional eligibility during the COVID-19 pandemic, raises substantial questions concerning the consistency and rationale of the eligibility restriction at issue here.

With respect to roster space, Mr. Tatos states a "scenario where an incoming athlete would need to compete for [sic] a fifth year athlete would only occur if the rosters were already full and could not accommodate an additional athlete. I have not seen any evidence that this would be the case, and to my knowledge, the NCAA has not identified any specific players that would lose their roster space if the Plaintiffs in this case were deemed eligible." [Id. at ¶ 58].

The Court finds this observation significant. Although the NCAA relies upon the potential displacement of other student-athletes as a justification for its position, the record presently before the Court does not identify any particular student-athlete who would actually lose a roster position as a result of plaintiffs receiving an additional year of eligibility. Nor has the NCAA identified evidence demonstrating that the relevant rosters are, in fact, full or that granting plaintiffs an additional year of eligibility would necessarily result in the displacement of incoming or current student-athletes. Thus, the NCAA's asserted concern regarding roster space appears, at this stage, to be based largely on a theoretical possibility rather than evidence of an actual consequence. A favorable ruling granting an injunction would not displace any student athlete. Such a ruling would only permit plaintiffs to *compete* for a roster spot on a team. The ruling would not compel any team to accept the player and force the team to have a roster spot for the player.

That distinction is important. The Court does not discount the possibility that granting an additional year of eligibility to certain student-athletes could affect roster composition or opportunities for other athletes. But where the NCAA relies upon such a potential effect to justify excluding an entire class of student-athletes, the Court would expect some evidentiary basis demonstrating that the asserted harm is likely to occur. On the present record, the NCAA has not sufficiently connected its generalized concern regarding roster space to any concrete impact on a particular student-athlete or roster.

The rosters for the 2026–27 seasons have essentially been set, and the "destabilized rosters for the 2026–27 season" do not exist. What does exist is that some schools have reserved roster spots that, without this Court's intervention, will go unfilled—it was represented by plaintiffs at the hearing that roster spots for all four (4) plaintiffs have been reserved. Therefore, the Court finds plaintiffs have met their burden of showing a substantial anticompetitive effect.

**2. Procompetitive Rationale**

The burden now shifts to the NCAA to set forth a "procompetitive rationale" for its restraint (which is to say, the Five for Five Rule). ***Alston***, 594 U.S. at 96 (citation modified). The NCAA may meet its burden by showing that such rationale, or rationales, "justify the anticompetitive effects." ***Law***, 134 F.3d at 1021 (citation modified)). *See also* ***Alston***, 594 U.S. at 99 ("[A]t step two the NCAA had to show only that those same rules collectively yield a procompetitive benefit." (citation modified)).

The NCAA says it has met its burden because the Rule has procompetitive benefits. *See* [Doc. 22 at 15–17]. Specifically, the NCAA argues that the Five for Five Rule provides

procompetitive benefits by preserving the structure and unique character of college athletics, including ensuring opportunities for incoming high school athletes and aligning athletic eligibility with the typical four (4)-year undergraduate experience. [Id. at 15]. The NCAA further argues that applying the new age-based eligibility rule retroactively would disrupt the 2026–27 season because roster spots, playing time, scholarships, and other team resources are limited, potentially displacing athletes who currently expect to compete. [Id. at 16–17].

The NCAA's argument proceeds from a flawed premise: that *excluding* athletes from the labor market is actually procompetitive. In the NCAA's own words:

> The decision to apply the new age-based framework going forward protects competitive opportunities and reliance interests of thousands of other student-athletes entering the 2026-27 season. The opportunities to participate in college sports are zero-sum. Roster spots are fixed. If Plaintiffs are permitted to join a roster, they may take away a spot from someone else who is eligible. Each contest has a fixed number of minutes in a game and opportunities to see the field or court at a given position. If Plaintiffs can compete, it will crowd out other student-athletes looking for their first opportunity, or opportunities to develop as their collegiate careers progress.

[Doc. 22 at 16]. Its argument about the Rule specifically not only suffers this same flaw (and assumes that all rosters are zero-sum, which evidence in the preliminary injunction record contradicts). But antitrust law does not endorse—or sustain—this understanding of markets or market output, i.e., that *reducing* laborers in a market is somehow

procompetitive. "[T]his justification runs afoul of the basic economic principle that greater competition in a labor market generally leads to better outcomes for workers." ***Martinson v. NCAA***, 804 F.Supp.3d 1109, 1130 (D. Nev. 2025) (citation modified). And the Court shares ***Martinson***'s concern that this rationale is an artificial attempt to "even the playing field" that "leads to lower wages for all workers." ***Id.*** *See also* ***Law***, 134 F.3d at 1021 ("Justifications offered under the rule of reason may be considered only to the extent that they tend to show that, on balance, the challenged restraint enhances competition." (citation modified)); ***New York ex rel. Schneiderman v. Actavis PLC***, 787 F.3d 638, 659 (2d Cir. 2015) ("While *introducing* [a product] may be procompetitive, that argument provides no procompetitive justification for *withdrawing* [another product]." (original emphasis)); ***Realcomp II, Ltd. v. F.T.C.***, 635 F.3d 815, 834 (6th Cir. 2011) (noting defendants can meet step two (2) burden by demonstrating "some countervailing procompetitive virtue—such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services." (citation modified)).

Ultimately, the Supreme Court explained the same concepts which were undisputed in the compensation litigation at issue in ***Alston***:

> No one disputes that the NCAA's restrictions *in fact* decrease the compensation that student-athletes receive compared to what a competitive market would yield. No one questions either that decreases in compensation also depress participation by student-athletes in the relevant labor market—so that price and quantity are both suppressed.

594 U.S. at 86 (citing 12 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 2011b, p. 134 (4th ed. 2019) (emphasis in original).

The same economic reality applies here. ***Alston*** recognized the close relationship between price and quantity in a monopsonized labor market: a restraint on compensation suppresses not only wages, but also participation. The converse follows as well. A direct restraint on the quantity of available labor—here, excluding a defined cohort of otherwise eligible student-athletes—distorts competition in the same market. That point is especially clear where the restraint operates as a categorical prohibition on one (1) transition class, no different in principle from randomly declaring one (1) out of every five (5) athletes ineligible so that the remaining athletes face less competition for roster positions. Nor can the NCAA justify the exclusion as necessary to preserve the character or quality of college athletics. The same fifth-year participation barred for the 2022–23 cohort will be permitted under the NCAA's own rules beginning next year. The challenged exclusion is therefore not a product-preserving eligibility rule; it is an exercise of monopsony power to restrict competition in the labor market.

Because the NCAA has not met its step two, procompetitive rationales burden, the Court's rule of reason analysis could conclude here—and conclude that plaintiffs have shown a likelihood of success on the merits of their Section 1 claim. Yet for the sake of completeness, the Court proceeds to analyze the third rule of reason step, which is whether—presuming that the NCAA actually met its step two, procompetitive burden—plaintiffs have shown the NCAA's proffered procompetitive rationales could be achieved through less restrictive alternatives.

### 3. Less Restrictive Alternatives

Presuming the NCAA has met its procompetitive effects burden, plaintiffs must now show that "the challenged conduct is not reasonably necessary to achieve the legitimate objectives or that those objectives can be achieved in a substantially less restrictive manner." ***Law***, 134 F.3d at 1019 (citation modified). *See also* ***Alston***, 594 U.S. at 100 (observing that plaintiffs met third step burden where "they were able to show that the NCAA could achieve the procompetitive benefits it had established with substantially less restrictive restraints").

The NCAA contends that simply increasing roster sizes would not eliminate these concerns because playing time and other resources remain finite and would be spread among more athletes. [Doc. 22 at 17].

Plaintiffs simply want to be treated like all other athletes under the Five for Five Rule, which is to say they want to be eligible for a fifth season of competitive play. And they identify a practical alternative to achieving their goal that would be entirely consistent with the Rule: granting them a waiver under the Rule for an additional year of eligibility, notwithstanding they are otherwise ineligible for such a year based on the year they graduated high school and the number of seasons in which they have competed so far.

Plaintiffs' proposed waivers, whose administration appear entirely possible and feasible under the NCAA's current Bylaws, would "eliminate the anticompetitive harm" that plaintiffs and class members face under the Rule's impending implementation. ***Braham***, 794 F.Supp.3d at 837. And granting plaintiffs eligibility waivers, to the extent that

they would qualify for them, is consistent with the NCAA's own proffered procompetitive rationale, insofar as expanding the number athletes in the relevant market—rather than artificially and arbitrarily limiting it—would expand output. *See* ***Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*** 961 F.2d 667, 673 (7th Cir. 1992) ("Rivalry makes for a more attractive product, which then attracts a larger audience—the very expansion of output that the antitrust laws foster."); ***Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.***, 61 F.3d 1250, 1253 (7th Cir. 1995) ("Output often grows in the process as competition intensifies."); ***Town of Concord, Mass. v. Bos. Edison Co.***, 915 F.2d 17, 21–22 (1st Cir. 1990) ("[A practice] harms that [competitive process] when it obstructs the achievement of competition's basic goals." (citation modified)). Thus, "Plaintiff's proposed alternative eliminates the anticompetitive harms discussed above while appearing to satisfy" the procompetitive rationale "advanced by the NCAA." ***Pavia***, 760 F.Supp.3d at 543.

**B. Irreparable Harm**

The parties dispute whether plaintiffs will suffer irreparable harm absent injunctive relief. *Compare* [Doc. 16 at 3] *with* [Doc. 22 at 23–24]. The Court need not dwell on this issue.

Courts have repeatedly found that "[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports." ***S.A. v. Sioux Falls School Dist. 49-5***, 2023 WL 6794207, at *9 (D. S.D. Oct. 13, 2023) (quoting ***Portz v. St. Cloud State Univ.***, 401 F.Supp.3d 834, 868 (D. Min. 2019); *see also* ***McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck***, 370 F.3d 275, 302 n.25 (2d Cir. 2004); ***Navarro v. Fla. Inst. of***

***Tech., Inc.***, 2023 WL 2078264, at *16–17 (M.D. Fla. Feb. 17, 2023) (courts have consistently held that losing the opportunity to participate in sports is irreparable harm); ***Biediger v. Quinnipiac Univ.***, 616 F.Supp.2d 277, 291 (D. Conn. 2009) ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis."); ***Brooks v. State Coll. Area Sch. Dist.***, 643 F.Supp.3d 499, 510 (M.D. Pa. Dec. 1, 2022); ***Mayerova v. E. Mich. Univ.***, 346 F.Supp.3d 983, 997 (E.D. Mich. 2018); *but see* ***Doe v. Portland Pub. Sch.***, 2023 WL 7301072, at *16 (D. Me. Nov. 3, 2023); ***Revesz v. Pa. Interscholastic Ath. Ass'n, Inc.***, 798 A.2d 830, 837 (Commonwealth Court of Pa. May 21, 2002).

The Court agrees with plaintiffs that they face the loss of a season of competition and exclusion from sports teams for which they might otherwise be eligible. This harm is certainly impending[19] and the inability to play in the upcoming (or ongoing) seasons cannot be "compensated after the fact by money damages." ***DTC Energy Grp., Inc. v. Hirschfeld***, 912 F.3d 1263, 1270 (10th Cir. 2018) (internal quotations and citations omitted). To the extent that plaintiffs face a loss of NIL compensation[20] as well, this harm does not displace the fundamental and irreparable harm they face if they are excluded from playing in the upcoming season. *See, e.g.*, ***Denver Rockets v. All-Pro Mgmt., Inc.***,

---

[19]For Jason Chambers, the harm is current. WVU Football has already played four (4) games.

[20]At least one (1) court has observed that lost NIL opportunities are not purely economic. *See* ***Braham***, 794 F.Supp.3d at 838 ("Regardless of whether such offers may result in calculable monetary compensation, the foregone opportunity to 'market' one's 'name' and 'likeness' and to 'showcase abilities to future employers' cannot be estimated or quantified." (citation modified)).

325 F.Supp. 1049, 1057 (C.D. Cal. 1971) (finding that "[i]f [movant] [were] unable to continue to play professional basketball . . . he w[ould] suffer irreparable injury in that a substantial part of his playing career will have been dissipated").

Accordingly, plaintiffs have met their irreparable harm burden.

### C. Balance of the Equities

Plaintiffs argue that the balance of the equities "strongly favors preliminary relief" because, absent injunctive relief, they "will permanently lose the opportunity to compete during the 2026–27 academic year, together with the educational, athletic, NIL, revenue-sharing, exposure, and professional-development opportunities that attach to that competition." [Doc. 16 at 36].

Moreover, an injunction that preserves this ability imposes "no cognizable prejudice" on the NCAA, given that granting plaintiffs injunctive relief would allow plaintiffs "the same opportunity to compete for available positions during the fifth year of eligibility that the NCAA now recognizes as appropriate under its own amended eligibility framework." [Id.].

The NCAA argues that granting plaintiffs' request for relief would be inequitable because plaintiffs' requested relief would not eliminate harm but merely shift it to other student-athletes. [Doc. 22 at 24–25]. Because college athletics are inherently competitive and roster spots, playing time, and scholarships are limited, the NCAA argues allowing plaintiffs to compete could displace other athletes who are not parties to the litigation. [Id.]. The NCAA also argues that granting relief to these plaintiffs could encourage similar challenges by other student-athletes, creating broader instability in NCAA eligibility rules. [Id.].

The Court is persuaded, like the Court in ***Wisne*** was, "upon review of the parties' arguments and the preliminary injunction record, that the harms the NCAA faces are much less severe. Fundamentally, Plaintiffs face *irreparable* harm, and the NCAA *itself* faces challenges in administering Plaintiffs' relief and ensuring their eligibility for the upcoming season. There is no contest between the two, and they resolve in Plaintiffs' favor. *See, e.g.*, ***Tennessee*** [***v. NCAA***], 718 F.Supp.3d [756,] 766 [(E.D. Tenn. 2024)] ("Here, the balance of the equities weighs heavily in favor of Plaintiffs because neither the NCAA nor any other affected individual or entity will face substantial harm with the issuance of an injunction, whereas, as explained above, student-athletes face irreparable harm."); ***Ohio***, 706 F.Supp.3d at 600 ("This Court does not see substantial harm to the NCAA that would result from this Court granting a temporary injunction. A prohibition on enforcing the Transfer Eligibility Rule causes no harm to the NCAA or any other entity or individual."); ***Braham***, 794 F.Supp.3d at 839; ***Pavia***, 760 F. Supp. 3d at 544." ***Wisne***, 2026 WL 2214234, at *22 (emphasis in original).

Granting four (4) athletes on three (3) teams relief will not destabilize college sports. Plaintiffs only seek the same opportunities as those who came before, and those who will come after.

### D. The Public Interest

Finally, the parties dispute whether issuance of a preliminary injunction would be in the public interest. *Compare* [Doc. 16 at 36–37] *with* [Doc. 22 at 24–25].[21] "As a practical

[21] The NCAA contends that the public interest weighs against an injunction because the judiciary should not be placed in the position of repeatedly determining individual eligibility under NCAA bylaws. [Doc. 22 at 24–25]. According to the NCAA, granting plaintiffs relief could create ripple effects throughout Division I athletics and disrupt the

matter, if a plaintiff demonstrates both likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." ***Am. Tel. and Tel. Co. v. Winback and Conserve Program, Inc.***, 42 F.3d, 1421 1427 n.8 (3d Cir. 1994).

Plaintiffs have met their burden of showing the public interest favors injunctive relief. As they observe, ensuring the NCAA's compliance with federal and state antitrust laws will serve the public interest, thus satisfying this factor. *See, e.g.*, ***Tennessee***, 718 F.Supp.3d at 766 ("Finally, the requested injunctive relief will serve the public interest because it will prevent anticompetitive behavior." (citation modified)); ***Ohio***, 706 F.Supp.3d at 600 ("Free and fair competition in labor markets is essential to the American economy."); ***Bigelow v. RKO Radio Pictures***, 327 U.S. 251, 266 (1946) ("The dominant purpose of the Anti-Trust Acts is protection of the public interest by prohibiting unjustifiable restrictions upon competitive enterprise.") (Frankfurter, J., dissenting).

## V. Rule of Restitution

Plaintiffs ask this Court to enjoin the NCAA's Rule of Restitution (Bylaw § 12.9.4.2) in addition to the Challenged Rules. [Doc. 6 at 23–24]. The NCAA does not address this in their Response.

NCAA Bylaw 12.9.4.2, commonly known as the "Rule of Restitution" provides:

---

expectations of other student-athletes, teams, and schools. [Id.]. Rather than eliminating harm, an injunction would simply reallocate limited roster spots and playing opportunities from other athletes to plaintiffs. [Id.].

In the preface to this Opinion, the Court gives its two cents regarding the weight increasingly being placed on the judiciary to resolve disputes arising from the ever-changing landscape of college athletics. But the reality is that the Court's hands are tied. Until something is done to bring greater clarity and consistency to the rules governing college sports, these difficult questions will continue to find their way into the courts.

**12.9.4.2 Restitution.** If a student-athlete who is ineligible under the terms of the bylaws or other legislation is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions:

(a) Require that individual records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(b) Require that team records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(c) Require that team victories achieved during participation by such ineligible student-athlete shall be abrogated and the games or events forfeited to the opposing institutions;

(d) Require that individual awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(e) Require that team awards earned during participation by such

ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(f) Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;

(g) Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in the seasons in which such ineligible student-athlete participated;

(h) Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in a contest selected for such telecast, or if the Board of Directors concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and

(i) Require that the institution that has been represented in an NCAA championship by such a student-athlete shall be assessed a financial penalty as determined by the Committee on Infractions.

[Doc. 13-2 at 58]. As this Court held in ***Ohio***:

The breadth of the Rule of Restitution is staggering and goes well beyond final adjudication on the merits in the NCAA's favor. It is in fact a measure

designed to inhibit a person's access to the courts.

Knowing this, many Division I institutions will not permit the student-athlete to compete, even if a court issues a temporary restraining order or a preliminary injunction finding that those rules are likely illegal. This, in turn, deters student-athletes from challenging the NCAA's substantive eligibility rules, such as the Transfer Eligibility Rule.

It appears to this Court that the Rule of Restitution's purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor. The Rule of Restitution forces student-athletes to run the risk of severe personal punishment and the risk of subjecting their institutions or teammates to the harsh sanctions of the Rule of Restitution simply by following the terms of a court order. For instance, suppose this Court issues an injunction that allows a student-athlete, like RaeQuan Battle, to play for the remainder of the 2023–2024 basketball season. Suppose, hypothetically, WVU goes on to win the Big 12 Championship and National Championship. If this Court does not enjoin NCAA Bylaw 12.11.4.2,[22] NCAA could require that WVU be stripped of the Big 12 and National Championship Titles, all over WVU following a court order

[22]The Rule of Restitution was revised on June 6, 2025, and effective on July 1, 2025. Since this Court's Opinion in ***Ohio***, the number of the Rule of Restitution has changed to NCAA Bylaw 12.9.4.2.

> instructing WVU that RaeQuan Battle is good to play on gamedays. Thus, this Court will enjoin NCAA from enforcing the Rule of Restitution against student-athletes and their respective institutions.

706 F.Supp.3d at 600–602. *See also* ***Pavia***, 760 F.Supp.3d at 545 (enjoining the NCAA from enforcing the Rule of Restitution); ***Elad***, 2025 WL 1202014, at *10–11 (same); ***Braham***, 2025 WL 2017162, at *10 (same).

It is self-evident that the Rule of Restitution would chill both plaintiffs' and WVU's ability to rely on this Court's injunction by exposing them to severe penalties should the injunction later be voluntarily vacated, stayed, or reversed. Consistent with its decision in ***Ohio***, this Court sees no reason to depart from that reasoning and holds that the Rule of Restitution must be enjoined for the injunction to have effect.

## VII. Conclusion

For the reasons set forth above, the Court will **GRANT** plaintiffs' Motion for Preliminary Injunction [**Doc. 13**]. The NCAA will be **ENJOINED** from enforcing the Five for Five Rule as it applies to Brenan Lorient, Javan Buchanan, Jason Chambers, and Benjamin McDougal. Brenan Lorient, Javan Buchanan, Jason Chambers, and Benjamin McDougal are permitted to compete for available roster positions at West Virginia University, or another NCAA Division I member institution as applicable, during the 2026–27 academic year without the NCAA treating that participation as a violation of its eligibility rules. No security will be required.

Finally, the NCAA is **ENJOINED** from enforcing its Rule of Restitution (Bylaw § 12.9.4.2) against Brenan Lorient, Javan Buchanan, Jason Chambers, and

Benjamin McDougal and/or West Virginia University for complying with, and relying on, this Order.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** September 30, 2026.

**JOHN PRESTON BAILEY**
**UNITED STATES DISTRICT JUDGE**